9 A.3d 547

**STATE of Maryland**

v.

**Gregory Maurice HARDING.**

**No. 0083, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Dec. 10, 2010.

Brian S. Kleinbord (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellant.

Ivan J. Bates (Thomas M. Donnelly, Donnelly & Mowery LLC, on the brief) Baltimore, MD, for appellee.

Panel: ZARNOCH, GRAEFF, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

CHARLES E. MOYLAN, JR., J. (Retired, Specially Assigned).

The decision in this State appeal from an adverse pretrial suppression ruling was filed on October 7, 2010, in order to satisfy the time limit established by Maryland Code, Courts and Judicial Proceedings Article, § 12–302(c)(3)(iii) (1973, 2006 Repl.Vol.). We reversed a pretrial order to suppress physical evidence. We indicated that an opinion explaining our decision would follow.

## A Strip Search

With yet no direct guidance from the Supreme Court, a nation-wide debate (or series of more or less related debates) has been raging over the extent to which the search of an individual for evidence may, in its intensity, go beyond the limits of the traditional search incident to lawful arrest and still be deemed reasonable within the contemplation of the Fourth Amendment. That debate, thus far, has produced far more heat than light. The case law and the academic commentary have been growing so prolifically that they are producing a chaotic sprawl. An effort has to be made to organize this growing mass of material into more manageable and comprehensible sub-units. Part of our goal in this opinion will be that of reducing the doctrinal clutter.

Our special concern on this appeal will be with the precise justification required to expand a routine search incident into what may be characterized as a "strip search." The law has been in a quandary about how to understand, and to explain, the relationship between the strip search and the search incident. The heart of the problem is that the strip search grows out of the search incident—but not automatically. In getting a handle on that troubled relationship, the key concepts will be 1) that a search incident does not demand particularization but 2) that a strip search (or anything more invasive) does.

## Procedural Background

The Grand Jury for Baltimore County returned an indictment on October 5, 2009, charging the appellee, Gregory

Maurice Harding, with the possession of cocaine with intent to distribute. The appellee moved, pretrial, to suppress the baggy of crack cocaine that fell to the floor as he took off his pants during what the suppression hearing judge described as a "strip search" at a police precinct headquarters. In ruling that the evidence would be suppressed, the judge found that the police did not have "a reasonable articulable suspicion to do the strip search":

So, the Court considered the testimony of the officers in this case who would be the only ones that could describe the reasonable articulable suspicion, as well as any of the evidence submitted, and this Court does not find reasonable articulable suspicion in this case—which the Court recognizes is a lower standard than probable cause—*but this Court does not find that there was a reasonable articulable suspicion to do the strip search.*

(Emphasis supplied).

### Legal Antecedents To the Station House Search

There is a single limited issue before us, and that is whether there was adequate justification for the more intensive search, characterized by the judge as a "strip search," that took place at the station house after the appellee's traffic stop and ultimate roadside arrest on the evening of September 10, 2009. As the hearing judge ruled, and as we agree, all of the steps taken by the police prior to that station house search were reasonable according to the Fourth Amendment.

### A. Traffic Stop:

On September 2, 2009, Detective Richard Hearn and Detective Timothy Stadler of the Vice and Narcotics Section of the Baltimore County Police Department received information from a "very reliable informant" that the appellee was selling crack cocaine out of a blue Audi, with the Maryland tag number 7EPG15, in the Towson and Parkville areas. The two detectives had been using that particular informant for between five and six months and he had provided "reliable" information in other cases that had "led to numerous CDS

arrests and search warrants." Another detective in the unit also stated that he had received a complaint two or three months earlier that a man named Harding was selling crack cocaine at a liquor store on Perring Parkway and McClean Boulevard.

On September 10, 2009, eight days later, Detectives Hearn and Stadler were conducting undercover surveillance on Joppa Road when they spotted the blue Audi with the license tag number that had earlier been supplied by the informant. The appellee was driving the Audi with no passengers.

The detectives called upon a marked police car, driven by Sergeant John Matthews, to make a traffic stop if the opportunity presented itself. *See Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Sgt. Matthews paced the Audi and found that it was traveling at a speed of 50 miles per hour in a 35 mile per hour zone. Seizing the opportunity, he stopped the Audi and issued it a written warning for speeding. The hearing judge ruled that the traffic stop did not offend the Fourth Amendment.

> *The first issue* that the Court has considered and has been raised *is the validity of the traffic stop* in the first place, whether or not the stop was appropriate. It's the Defendant's position that the stop was not appropriate based on what was there. However, *this Court,* in looking at the totality of the circumstances and the information that the police had, *believes that the stop was appropriate;* that there was sufficient grounds to make the stop; that based on the information—and the law is very clear that *if there is sufficient information to make a stop,* that *the State* or the government *is allowed to make traffic stops* and look for technical violations in order to find more information. That is totally appropriate. It's condoned by the Courts, and *in this case this was a proper traffic stop.*

(Emphasis supplied).

No issue in that regard is now before us.

## B. The Canine Alert:

As a routine part of the traffic stop, Sgt. Matthews checked, via police radio, the appellee's driver's license number and vehicle registration. While that checking was in process, the two detectives called in a K–9 unit. Within two minutes of the initial traffic stop, Officer Samantha Roberts was on the scene with her trained drug-sniffing dog, Aaron. Aaron alerted twice on the Audi, once at the driver's side door and then again on the driver's seat. The hearing judge also ruled that this stage of the investigation passed constitutional muster.

> So, then the next question is whether or not his calling in of the K–9 Unit was proper based on the evidence presented. It's the Defendant's position that basically the dog shouldn't have been called based on the information, but this Court disagrees. This Court finds there was sufficient information based on evidence that the State had—which is what the police had—to call the K–9.
>
> There is no issue raised that the dog was called in late or it was some timing issue. It was actually very quick. So, there's no issue on that. Now, as to the second issue *in terms of propriety of the K–9 unit being called in, the Court finds that was proper.*

(Emphasis supplied).

There is no issue before us in this regard. Actually, of course, as long as the automobile is still properly being detained, the police need no justification for calling in the K–9 unit. The hearing judge found more than was necessary.

## C. Arrest Based on K–9 Alert:

There is also no question but that Aaron's positive alert furnished probable cause for both a *Carroll* Doctrine search of the Audi and for the arrest of the appellee as the driver of the Audi. In *State v. Ofori,* 170 Md.App. 211, 229–34, 906 A.2d 1089 (2006), on which the hearing judge relied, we began this part of our analysis by quoting from *Fitzgerald v. State,* 153 Md.App. 601, 620, 837 A.2d 989 (2003), *aff'd,* 384 Md. 484, 864 A.2d 1006 (2004), and then went on:

*The same degree of certainty that will support the warrantless Carroll Doctrine search of an automobile will, ipso facto, support the warrantless arrest of a suspect.*

153 Md.App. at 620, 837 A.2d 989. We thought that what we there said meant that, in circumstances such as those involving a K–9 sniff, *probable cause to search the vehicle is, ipso facto, probable cause to arrest, at the very least, the driver.* If any further clarification is necessary, that is, indeed, what we meant.

The Supreme Court's decision in *Maryland v. Pringle,* 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), is absolutely dispositive. Because of the close association between contraband in a vehicle and the driver of (or other passenger in) the vehicle, either finding the drugs in the vehicle, as in *Pringle,* or probable cause to believe that they are in the vehicle, as in this case, necessarily implicates the driver and passengers. Whatever the level of certainty we have reached with respect to the presence of contraband itself, its association with the occupants of the vehicle is the same. In terms of that inculpatory association, the Supreme Court's unanimous opinion observed:

We think it *an entirely reasonable inference* from these facts *that any or all three of the occupants had* knowledge of, and exercised *dominion and control over, the cocaine. Thus,* a reasonable officer could conclude that *there was probable cause to believe Pringle committed the crime of possession* of cocaine, either solely or jointly.

540 U.S. at 372, 124 S.Ct. 795 (emphasis supplied).

In *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the Supreme Court, as part of a hypothetical discussion, stated that a positive K–9 "alert" on a suspect's luggage would amount to probable cause for the suspect's arrest.

*A positive result [from the canine sniff] would have resulted in his justifiable arrest on probable cause.*

460 U.S. at 506, 103 S.Ct. 1319.

In *Ricks v. State*, 322 Md. 183, 586 A.2d 740 (1991), the Court of Appeals similarly concluded that *a positive "alert" on a suspect's luggage was not only probable cause to search the luggage but, ipso facto, probable cause to arrest the possessor of the luggage.*

> *Ricks does not contest* the intermediate appellate court's determination, which affirmed the trial court's denial of the motion to suppress, *that his arrest was supported by the requisite probable cause.* Indeed, at oral argument before us, Ricks conceded that *he was lawfully arrested,* at least *at the point when the dog scratched his bag, indicating that it contained narcotics.*

322 Md. at 188, 586 A.2d 740 (emphasis supplied).

In *Wilkes v. State*, 364 Md. 554, 774 A.2d 420 (2001), Judge Cathell, after stating that a canine "alert" had supplied probable cause to justify a warrantless automobile search, surmised that it might *ipso facto* support a warrantless arrest as well:

> Moreover, *some jurisdictions have held that once a drug dog has alerted* the trooper to the presence of illegal drugs in a vehicle, *sufficient probable cause existed to support a warrantless arrest.*

364 Md. at 587 n. 24, 774 A.2d 420.

170 Md.App. at 229–31, 906 A.2d 1089 (emphasis supplied).

In *Ofori*, we went on, 170 Md.App. at 233–34, 906 A.2d 1089, to refer to our earlier analysis of the identity between probable cause to search a vehicle and probable cause to arrest the driver in *State v. Funkhouser.*

In any event, we are applying the law as we laid it down in *State v. Funkhouser*, 140 Md.App. 696, 721, 782 A.2d 387 (2001):

> *The probable cause developed by the initial canine "alert" was* at one and the same time *probable cause to believe* both 1) that drugs were probably then in the car and 2) *that its driver* and sole occupant *probably was then or recently had been in unlawful possession of those drugs.*

(Emphasis supplied). The fact that the appellee here was not the "sole occupant," but only one of two, does not alter the result.

The similarity between probable cause for a *Carroll* Doctrine search and probable cause for an arrest was analyzed by the *Funkhouser* opinion.

> The legal conclusions to which probable cause points are, albeit frequently related, slightly different in the cases of a warrantless automobile search and a warrantless arrest. One concerns a crime by a person; the other concerns evidence in a place. *The factual predicate for those respective conclusions was,* however, *identical in this particular case.*

> In terms of quantifiable probability, moreover, *the probable cause for a Carroll Doctrine search is the same as the probable cause for a warrantless arrest. . . .* It does not take more probable cause to support a warrantless arrest than it does to support a warrantless automobile search. The classic *Brinegar v. United States* [338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879] (1949) definition of probable cause is used for both conclusions alike, with *no distinction made between the predicate for an automobile search and the predicate for a lawful arrest. Although the closely related predicates may sometimes differ slightly in terms of qualitative content or substance, they do not differ quantitatively in terms of degree of their probability. The measure of likelihood is the same.*

*Id.* (emphasis supplied).

The identity of the probable cause focused on the car and on its driver in *Funkhouser* was indistinguishable from that same identity of probable cause in the case now before us.

> *[T]he canine "alert" could have provided,* all else being assumed to have been constitutional, a double *justification for two related but separate and distinct Fourth Amendment events.* The police not only had *probable cause to search the Jeep* Wrangler; they also had *probable cause to arrest Funkhouser as its driver.*

*Id.* (emphasis supplied).

Based on this authority, the hearing judge put her imprimatur firmly on the arrest of the appellee for the probable possession of narcotics.

> Then *the next issue is whether or not there is probable cause to arrest, and whether there was an arrest* at the scene. In looking at the circumstances of this case it's very clear to this Court that *there was an arrest done at the scene.* The Defendant was placed in handcuffs, and although there was some differing testimony as to when the arrest occurred, *clearly the Defendant was arrested.* Then the question is *was there probable cause to arrest him, and based on the Ofori case, there was.* I mean, all that *Ofori* says very clearly—and that's why I asked Mr. Bates if there is anything distinguishable, but based on *Ofori* which clearly says for a driver, not for a passenger, but *for a driver,* that *that K–9 positive alert is enough [for] probable cause to arrest.* So, that's all you need. You don't need anymore information.
>
> *Ofori,* I read it a couple times, and I could not find anything in *Ofori* that distinguishes *Ofori* from this case. So, I believe the case law now in Maryland is under *Ofori,* which is 170 Maryland App. 211 [906 A.2d 1089], a 2006 case, that *if you have a driver and you have a positive alert, you could arrest without anything else. So then you could do a search incident to arrest,* which was done in this case.

(Emphasis supplied). Both the "alert" by Aaron and its inculpatory significance are beyond challenge.

### D. The Search Incident to Lawful Arrest of the Appellee and the *Carroll* Doctrine Search of the Audi:

Aaron's positive "alert" on the Audi established the probable cause that triggered two investigative consequences. It was the predicate for a warrantless *Carroll* Doctrine search of the Audi. The two detectives conducted what they described as a "very thorough search" of the vehicle, looking in door panels, air vents, hidden compartments, and everywhere else

that they could without damaging the car. Detective Stadler testified that his experience as a narcotics detective made him familiar with the places in an automobile where narcotics could be concealed and that he searched all of those areas to the best of his ability. No narcotics were recovered in the vehicle search.

Aaron's positive "alert" also gave the detectives probable cause to arrest the appellee, which they did. The arrest, in turn, *ipso facto* justified a warrantless search incident to lawful arrest. Detective Hearn conducted the search incident, reaching into the appellee's pockets and patting down his pant legs. Detective Hearn did recover $1,474 in cash from the appellee's front and back pockets, but found no contraband. The hearing judge also ruled that the warrantless search incident was constitutionally reasonable:

*So then you could do a search incident to arrest, which was done in this case.*

There was from what I heard two searches done at the time at the scene. The first search that was done by Detective Hearn was a fairly comprehensive search. It was certainly not a *Terry* search. It was a search that included as he described it—and there was no evidence that they were looking for any weapons, *they clearly were looking for drugs.* I believe *Detective Hearn even said he was not looking for weapons.*

So, *this search included the turning out of the pockets, it included a pat down of his legs* as testified to by Detective Hearn. They found cash in his wallet. They found cash in, at least, one or possibly two pockets and found nothing else. This Court, in listening and evaluating the credibility of the witness in this case, found that *the search which was incident to that arrest*—which I do find that they had probable cause to do the arrest based on *State versus Ofori,* that *the search at the scene was appropriate in terms of being a search incident to the arrest,* and was a fairly substantive search in terms of doing a body search using a flashlight turning out pockets and patting down his legs. There was some testimony that there was a search done

again, some sort of pat down done again before he gets into the vehicle where nothing was disclosed.

(Emphasis supplied). At this point, we are at the threshold of the world beyond search incident.

### Beyond Search Incident

Detective Hearn concluded that it was necessary to take the search beyond the limits permitted for a routine search incident to lawful arrest. He told the appellee that he "had reasonable suspicion that [the appellee] had more CDS on him and we needed a further search." The detective testified that he believed that the appellee was concealing contraband in an area of his body that was not accessible during the search of the appellee's clothing. Detective Hearn testified specifically:

My five years as a detective in the [Community Drug and Violence Interdiction Team] Unit has made me learn that *drug dealers a lot of times would store drugs in their pocket or pant leg* and conceal drugs. *It takes more than a cursory search to find various items most of the time.*

(Emphasis supplied).

Once the situs of the strip search was moved to the precinct station in order to insure maximum privacy, it appears that the pertinent part of the ensuing search never progressed beyond the removal of the appellee's pants. As the appellee was removing his pants, the critical baggy of crack cocaine dropped out of them and fell to the floor. Detective Hearn ´ described the scene:

THE COURT: I don't understand and, perhaps, I missed it, but *when you found the CDS in his* I think you said *pants leg* at the station when you did the strip search, can you explain to me what that means? *Where exactly did you find it?*

THE WITNESS: *When we asked him to remove his pants, we picked it up and it fell through the pants leg onto the floor.* I don't know where it was tied to, but *it was within his pants somewhere,* and *when we shook the pants*

*it fell out.* So, it could have been loose or it could have been tied to something and fell.

THE COURT: *You found this after he took his pants off and you shook the pants and it fell out of the pants leg?*

THE WITNESS: *Yes.*

(Emphasis supplied).

It was the Fourth Amendment intrusion to that point that produced the evidence that was excluded. That is, therefore, the only Fourth Amendment intrusion that concerns us. If the searching procedure for some reason went on beyond that point (it is very unclear whether it did or not), it produced no further evidence and, for purposes of the suppression ruling, is therefore meaningless. Police behavior, even if sadly reprehensible, that has no evidentiary consequences may be of interest to a police review board but it is of no interest to a suppression hearing.

### Modality Issues Versus Justification Issues

As we move now into the world beyond search incident, a more intensive examination of or into the body of a suspect gives rise to two very different types of problems. There is first the question of what is a reasonable justification for a more intensive search or examination of the body, an issue that we will be addressing *infra* as the key issue in this opinion. Even granting full justification for a more intrusive search of the body, however, there is also the distinct question of the modality of conducting such a search. The concern in such a case is not with justification at all, but rather with the manner in which even a fully justified further search or examination is carried out. Those modality concerns focus on such things as privacy or unnecessary embarrassment or hygienic conditions or, in the more extreme cases, medical risk to the health of the suspect.

As the law moves into the relatively uncharted territory beyond search incident, it will facilitate understanding and avoid unnecessary confusion if we can separate the modality cases from the justification cases, as two strands of caselaw

dealing with very different issues. Maryland now has four entries in the beyond-search-incident caselaw: 1) both *Nieves v. State,* 160 Md.App. 647, 866 A.2d 870 (2004), and *State v. Nieves,* 383 Md. 573, 861 A.2d 62 (2004), deal with a single case; 2) *Paulino v. State,* 399 Md. 341, 924 A.2d 308 (2007); 3) *Stokeling v. State,* 189 Md.App. 653, 985 A.2d 175 (2009); and 4) Judge Kenney's recent addition to the literature in *Moore v. State,* 195 Md.App. 695, 7 A.3d 617 (2010).

Of these, *Paulino v. State* should, for future analytic convenience and efficiency, be placed in a separate category from the other three. *Paulino* is exclusively a modality case and not a justification case. It does not address what, if any, additional justification may be required for a search incident to go beyond, in intensity, what a routine search incident clearly permits. The justification for what the opinion sometimes called a "strip search" and sometimes called a "visual body cavity search" was essentially just assumed to exist in *Paulino* and the focus of the opinion was clearly on the manner and place in which the search was conducted. At the very outset of the opinion, its concern was announced:

> This case requires us to consider whether a search conducted incident to an arrest is *reasonable* under the Fourth Amendment *in light of the manner and place in which the search was conducted* . . . .

399 Md. at 344, 924 A.2d 308 (emphasis supplied).

The problem in that case was that the police had conducted the more than ordinarily intrusive search in the bay of an open-air car wash rather than in a more secluded environment. The opinion went on:

> *The crux of this case* . . . *is* not whether the police had the right to search Paulino, but instead *whether* an exigency existed such that *an invasive search, conducted at the scene of the arrest, was reasonable.*

399 Md. at 357, 924 A.2d 308 (emphasis supplied).

The thrust of the case, quintessentially a modality case, was that if the police are going to execute something like a "strip

search," steps should be taken to shield the searchee from public view.

> There is no dispute that members of the public were present, specifically, the other passengers in the Jeep Cherokee. It is their presence, whether their view was obscured or otherwise, that makes the search of Paulino unnecessarily within the public view and thus violative of the Fourth Amendment. *The police could have taken any number of steps, including* patting Paulino down for weapons at the scene of the arrest and *conducting the search* inside the Jeep Cherokee vehicle in which Paulino was a passenger, or *at the police station, to protect Paulino's privacy interest.* Similarly, the police could have conducted the search in the privacy of a police van.

399 Md. at 360–61, 924 A.2d 308 (emphasis supplied).

Modality issues, of course, are not necessarily confined to the questions of privacy and possible embarrassment that were dealt with in *Paulino.* As a case such as *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), illustrates, where a blood sample was taken to test for blood alcohol content, certain modality issues will focus on such things as hygienic conditions and whether those taking the blood or administering certain tests have the required medical training.

> Finally, the record shows that *the test was performed in a reasonable manner. Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices.* We are thus not presented with the serious *questions which would arise if a search involving use of a medical technique,* even of the most rudimentary sort, *were made by other than medical personnel or in other than a medical environment*—for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain.

> ... *That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.*

384 U.S. at 771–72, 86 S.Ct. 1826 (emphasis supplied).[1]

In the present case, there is no modality problem and cases such as *Paulino,* therefore, may conveniently be set off to the side. In this case, the detectives testified that they were not allowed to perform a more invasive search of the appellee in public because of the privacy concerns articulated by *Paulino.* Accordingly, the appellee was transported to the Precinct Six Station so that the detectives could perform the further search of the appellee in a private room. Per departmental policy, the superior officer at the precinct, Sergeant Reagan, authorized the "strip search" that was then conducted. The modality concerns of *Paulino* were fully satisfied. Our analysis will focus on the distinct and very different issue of justification for a search that goes beyond the routine search incident.

■ Were the privacy of a strip search the issue before us, *Paulino* would be our gold standard. When the issue before us, however, is one of justification rather than one of modality, we may conveniently put *Paulino* and other modality cases to the side. The two issues do not mix. An excess of punctilious modality will not make up for a lack of substantive justification.

### The National Border And Institutional Security

In our effort to reduce the doctrinal clutter, we may also conveniently put to one side two strands of case law that touch the general reasonableness of the strip search (and beyond) only tangentially. They represent two prominent situations in which there is a substantially reduced Fourth Amendment protection. One of these is at the national border. The other

---

**1.** Whether a strip search is conducted by an officer of the same sex as the searchee would also be a modality concern.

is where there is a concern for institutional security, as in the case of jails and prisons.

## A. Border Searches:

*United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), is the seminal case involving a very intensive probing even into the body of a suspected drug smuggler at the national border. The suspect had arrived at the Los Angeles Airport on a flight from Bogota, Columbia. A customs official noticed from her passport that she had made eight recent trips to either Miami or Los Angeles. She spoke no English and had no family or friends in the United States. She had $5,000 in cash but could not recall how her airline ticket had been purchased. The customs officials suspected that she was a "balloon swallower," one who attempts to smuggle narcotics into the country hidden in her alimentary canal.

A strip search followed. The searching matron felt the suspect's abdomen and found it to be firm and full. The suspect was wearing two pairs of elastic underpants with a paper towel lining the crotch area. For sixteen hours the suspect then resisted going to the toilet. The suspect, on the order of a federal magistrate, was given an X-ray and a pregnancy test. A physician conducted a rectal examination and removed a balloon containing cocaine. Ultimately the suspect, over four days, passed eighty-eight balloons containing 528 grams of 80% pure cocaine. The Court of Appeals for the Ninth Circuit held that the search violated the Fourth Amendment.

In reversing the Ninth Circuit, Justice Rehnquist explained the lesser expectation of privacy that prevails at an international border.

*Consistently,* therefore, *with Congress' power to protect the Nation by* stopping and *examining persons entering this country, the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior. Routine searches* of the persons

and effects of entrants *are not subject to any requirement of reasonable suspicion, probable cause, or warrant,* and first-class mail may be opened without a warrant on less than probable cause. Automotive travelers may be stopped at fixed checkpoints near the border without individualized suspicion even if the stop is based largely on ethnicity, and boats on inland waters with ready access to the sea may be hailed and boarded with no suspicion whatever.

473 U.S. at 538, 105 S.Ct. 3304 (emphasis supplied).

Even at an international border, however, a search as intensive as this one required some special justification. *The Supreme Court set that justification at the level of reasonable particularized suspicion.*

We hold that *the detention of a traveler* at the border, *beyond the scope of a routine customs search and inspection, is justified* at its inception if *customs agents,* considering all the facts surrounding the traveler and her trip, *reasonably suspect that the traveler is smuggling contraband* in her alimentary canal.

*The "reasonable suspicion" standard has been applied in a number of contexts and effects a needed balance* between private and public interests *when law enforcement officials must make a limited intrusion on less than probable cause.* It thus fits well into the situations involving alimentary canal smuggling at the border: *this type of smuggling* gives no external signs and inspectors *will rarely possess probable cause to arrest or search,* yet governmental interests in stopping smuggling at the border are high indeed. Under this standard *officials at the border must have a "particularized and objective basis for suspecting the particular person"* of alimentary canal smuggling.

473 U.S. at 541–42, 105 S.Ct. 3304 (emphasis supplied).

What is reasonable at the national border, however, is not necessarily reasonable in the interior of the country. The case has no more than tangential materiality.

## B. Institutional Security:

But for some helpful dicta, the cases of *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); and *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), may also conveniently be set aside as tangential, in that the more intensive searches permitted in those cases were justified largely on the basis of institutional security.

In *Bell v. Wolfish,* a class action by pretrial detainees challenged five separate practices imposed on the detainees by officials and guards at a federal detention center in New York City. One of the practices was a required strip search of a detainee, including a visual examination of body cavities, following every visit to the detainee from a person from outside the institution. Following such visit, no further justification was required. Justice Rehnquist's opinion for the Court, 441 U.S. at 558, 99 S.Ct. 1861, described the extent of the search:

> *Inmates* at all Bureau of Prisons facilities, including the MCC, *are required to expose their body cavities for visual inspection as a part of a strip search* conducted after every contact visit with a person from outside the institution. Corrections officials testified that *visual cavity searches were necessary* not only *to discover* but also to deter *the smuggling of weapons, drugs, and other contraband into the institution.*

(Emphasis supplied).

The opinion went on to explain that a male being searched is required to lift his genitals and to bend over and spread his buttocks for visual inspection. A female being searched is required to bend over for a visual inspection of her anal and vaginal cavities. The Supreme Court held that because of the special needs of institutional security, such searches, without further justification, were reasonable:

> [A]ssuming for present purposes that inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facili-

ty, we nonetheless conclude that *these searches do not violate that Amendment.* The Fourth Amendment prohibits only unreasonable searches, and under the circumstances, *we do not believe that these searches are unreasonable.*

*The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.* Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence.* And *inmate attempts to secrete these items* into the facility *by concealing them in body cavities are documented* in this record.

441 U.S. at 558–59, 99 S.Ct. 1861 (emphasis supplied).

Justice Powell dissented from that part of the majority opinion authorizing the body cavity inspection, believing that some more particularized justification should be required. He proposed that such justification be at the "reasonable suspicion" level.

I join the opinion of the Court except the discussion and holding with respect to body-cavity searches. In view of the serious intrusion on one's privacy occasioned by such a search, *I think at least some level of cause, such as a reasonable suspicion, should be required to justify the anal and genital searches described in this case.*

441 U.S. at 563, 99 S.Ct. 1861 (emphasis supplied).

*United States v. Edwards* had actually been decided five years before *Bell v. Wolfish* and touched only tangentially on institutional security. Edwards had been arrested at eleven o'clock at night for an attempted break-in at the local post office. He was taken to the local jail and placed in a cell for the night. Ten hours after his arrest, he was ordered to hand

over to the police his shirt and pants; substitute clothing was provided him. Basically, the Supreme Court's holding was simply an extension of the time limits for a search incident to lawful arrest, reasoning that "searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." 415 U.S. at 803, 94 S.Ct. 1234. In a footnote, however, the Supreme Court did touch upon the venerable entitlement of a jailer to conduct "searches incident to incarceration":

> Historical evidence points to *the established and routine custom of permitting a jailer to search the person who is being processed for confinement* under his custody and control. While "[a] rule of practice must not be allowed . . . to prevail over a constitutional right," *little doubt has ever been expressed about the* validity of *reasonableness of such searches incident to incarceration.*

415 U.S. at 805 n. 6, 94 S.Ct. 1234 (emphasis supplied).

*Illinois v. Lafayette* was a case in which the defendant had been arrested for disturbing the peace at a local motion picture house, a crime for which there would be, as a rule, no physical evidence. Nonetheless, the search of his effects at the police station yielded contraband amphetamine. Chief Justice Burger posed the question before the Court as one of "whether, at the time an arrested person arrives at a police station, the police may, without obtaining a warrant, search a shoulder bag carried by that person." 462 U.S. at 641, 103 S.Ct. 2605.

Eschewing any search incident analysis, the Court posed the issue before it as one involving the "booking and jailing" process at the station house:

> The question here is whether, consistent with the Fourth Amendment, it is reasonable for police to search the personal effects of a person under lawful arrest as *part of the routine administrative procedure at a police station house incident to booking and jailing the suspect. The justification for such searches does not rest on probable cause, and*

*hence the absence of a warrant is immaterial to the reasonableness of the search.*

462 U.S. at 643, 103 S.Ct. 2605 (emphasis supplied).

The Chief Justice's analysis went so far as to suggest that the "disrobing of an arrestee" that might not be appropriate on the street might nonetheless be reasonable as one of the "practical necessities of routine jail administration."

The *governmental interest underlying a station-house search* of the arrestee's person and possessions *may in some circumstances be even greater than those supporting a search immediately following arrest.* Consequently, the scope of a station-house search will often vary from that made at the time of arrest. *Police conduct that would be* impractical or unreasonable—or *embarrassingly intrusive—on the street can* more readily—and privately—*be performed at the station.* For example, *the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street, but the practical necessities of routine jail administration may even justify taking a prisoner's clothes before confining him,* although that step would be rare.

462 U.S. at 645, 103 S.Ct. 2605 (emphasis supplied). *See also Hudson v. Palmer,* 468 U.S. 517, 524, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) ("The curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of institutional needs and objectives of prison facilities, chief among which is internal security."). But see *Blackburn v. Snow,* 771 F.2d 556, 567 (1st Cir.1985), for the very different situation involving strip searches of visitors to a prison rather than strip searches of the prisoners themselves. As justification for such searches, the First Circuit insists upon "a more particularized level of suspicion." 771 F.2d at 567.

Just as the national border presents a special case, so too do these searches in furtherance of institutional security. Again in the service of reducing the clutter, we may conveniently put them to one side. In dealing with the straightforward justification for an investigative strip search, we do not need to be

confused either by modality issues or by strip searches at the national border or in the interest of institutional security. In reducing confusion, less is sometimes more.

## The Promiscuous Proliferation of Categories

As we narrow the focus onto the required justification for an investigative procedure that is more invasive than the traditional search incident to lawful arrest, an investigative procedure that for the moment we will call simply a "strip search," the first question to be addressed is that of how many legally cognizable levels of further invasiveness are we going to have to deal with. This is important for one reason; it will determine how many levels of justification will have to be devised. Self-evidently, we cannot have more levels of invasiveness than there are levels of justification to go around. Descriptively, of course, we can have any number of such gradations, but the soaring flights of poesy may soon overwhelm the available levels of Fourth Amendment justification. Our initial effort will be to reduce the poetry and to concentrate on Fourth Amendment justification.

Although in *State v. Nieves,* 383 Md. 573, 861 A.2d 62 (2004), the actual holding of the Court of Appeals did not require its analysis to deal with anything beyond a generic strip search, its preliminary discussion, 383 Md. at 586, 861 A.2d 62, did suggest, by way of dicta, at least two legally cognizable categories of further intrusion beyond search incidents: a strip search and "body cavity searches" (presumably both the visual and manual varieties).

> There is a distinction between a strip search and other types of searches, such as *body cavity searches,* which could involve visually inspecting the body cavities or physically probing the body cavities. Based upon the record, *it appears that a strip search was conducted rather than a physical body cavity search.*

(Emphasis supplied). *See* William J. Simonitsch, *Visual Body Cavity Searches Incident to Arrest: Validity Under the Fourth Amendment,* 54 U. Miami L.Rev. 665, 667 (2000).

What was perhaps implicit in the *Nieves* discussion was made explicit by some preliminary dicta in *Paulino v. State, supra,* 399 Md. at 352–53, 924 A.2d 308 (2007), and that was that "[t]here exist [not two but] three separate categories of searches" beyond search incident. Although not necessary to the *Paulino* decision, which dealt only with a modality issue, the opinion, *id.,* quoted with approval from *Blackburn v. Snow,* 771 F.2d 556, 561 n. 3 (1st Cir.1985):

> A *"strip search,"* though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. *A "visual body cavity search"* extends to a visual inspection of the anal and genital areas. *A "manual body cavity search"* includes some degree of touching or probing of body cavities.

(Emphasis supplied).

In further defining those three levels of intrusiveness, *Paulino,* 399 Md. at 352 n. 3, 924 A.2d 308, quoted from the Simonitsch law review article at 667–68:

> Mr. Simonitsch defines *a strip search as involving the removal of clothing for inspection of the under clothes and/or body and "includ[ing] only those searches that do not involve a visual or manual inspection of the genitals or anus";* visual body cavity search *"include* [s] only searches where there is a visual inspection of a person's genitals or anus, but no physical contact or intrusion"; *manual body cavity search includes* "not only those [searches] performed by insertion of, or manipulation with, the fingers, but also endoscopic examinations and the use of gynecological devices."

(Emphasis supplied). *See also McGee v. Texas,* 105 S.W.3d 609, 615 (Tex.Crim.App.2003).

The three-judge dissenting opinion in *Paulino,* moreover, may have gone so far as to introduce yet a fourth entry into the "beyond search incident" sweepstakes, with the "reach-in" search. The dissent, 399 Md. at 364, 924 A.2d 308, defined the "reach-in" search:

*[A] "reach-in" search,* or a search of a clothed suspect wherein the officer conducting the search reaches between an individual's clothing and his skin, without exposing the individuals genitalia to onlookers, *is not the same as a strip search* or visual body cavity search and *its reasonableness is measured by this limited intrusiveness* weighed against the needs of the police to seize drugs they believe are secreted on a suspect's body.

(Emphasis supplied).

Whoa! That's too many already. The subdivision of searching levels soon passes the point of diminishing returns. We just don't have enough justifications to go around. At this point, moreover, we are not yet allowing a place in the invasiveness hierarchy for the medical or quasi-medical investigative procedures dealt with in such cases as *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), a special category of bodily searches we shall look at briefly, *infra.*

There is a double reason, of course, for putting a brake on the proliferation of legally cognizable levels of intrusiveness. There is only one reason for having a legally cognizable level of search, except of course for poetic purposes,[2] and that is to condition the resort to such a search by requiring a legally cognizable level of justification. A distinct category of search needs a distinct justification, but there are simply not that many possible levels of justification available. Without some workable burden of production by which to justify a more intrusive search, the whole reviewing process could degenerate into standardless and largely subjective appellate second-guessing.

---

**2.** It is hard to top the description in *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1272 (7th Cir.1983), of "strip searches involving the visual inspection of the anal and genital areas ... as demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." The author of that oft-quoted Philippic, in addition to having a great Thesaurus, had obviously never done his two years in the Army.

■ An even more obvious reason to curb the proliferation of categories is that the whole purpose of the Fourth Amendment is to make sure that the police officer, when searching and seizing, acts reasonably. If we create a metaphysical problem so multi-layered and intricately complex that no policeman will ever understand it, we reduce the Fourth Amendment to a nullity. A search for evidence is not a Platonic dialogue. As Justice Rehnquist observed in *United States v. Montoya de Hernandez*, 473 U.S. at 541, 105 S.Ct. 3304, "subtle verbal gradations may obscure rather than elucidate the meaning of the provision in question."

### The Strip Search As a Big–Tent Category

The goal has to be one of simplification. Even without such flourishes as the "reach-in" search at the near end of the strip search continuum and the visual body cavity search at the far end, the strip search proper could itself easily be treated as multi-layered by those who enjoy such elaboration, if we allowed proliferation to go unchecked. A strip search entails progressive disrobing. With the special concerns being the invasion of privacy and the subjecting of the searchee to embarrassment, the subject who stands completely nude before the inquisitive eye of the officer or matron will presumably feel more compromised than will another subject just loosening the necktie or unbuttoning the top button of a shirt or blouse. Be that as it may, both at those extremes and at numerous points in between, a manageable regime of Fourth Amendment justification demands a bright-line formula. A workable standard of judicial review of police behavior simply cannot insist upon one level of justification for the removal of the outer pants and a higher level of justification for the removal of the underpants. Although both the level of exposure and the level of embarrassment can be progressive, there is no legally cognizable categorical distinction between a full strip search and a half strip search or between a three-quarter strip search and a one-quarter strip search. Unless judicial review is to be reduced to unbounded *de novo* and subjective balancing, a single identifiable justification must suffice for a

single and undivided strip search, even if its spectrum is a broad one.

The strip search technique described by the Baltimore County police for the search in this case and in similar cases was one involving, almost of necessity, progressive disrobing. At the suppression hearing, Detective Stadler explained the procedure routinely employed:

We start by asking them to *remove one article of clothing at a time. If they start with their shirt, we go through the shirt and check it inside out,* pockets, seams, check for any hidden pockets that may have been manufactured later. Some people have inside pockets that they put in later. *We only search one article of clothing at a time. Once we are done searching it, we have to ask the person to remove the next article of clothing.* We get to the point where they are down to just their undergarments, and at that point we ask them to remove undergarments, bend down, squat and cough, and if nothing is recovered we give them their clothing.

Q: What is the purpose of asking them to bend down, squat and cough?

A: Just to make sure they don't have anything inside the crevices that we couldn't see if they were standing.

(Emphasis supplied). He self-evidently described incremental stages of a single legally cognizable level of searching and did not advert to six to ten different levels of searching with six to ten incremental levels of justification.

### The Extreme Ends of the Strip Search Continuum

### A. The Reach-in Search:

How then do we reduce proliferation? The same rationale of categorical inclusion commends itself at both ends of the strip search continuum as well as in the middle. At the near end of the continuum, the so-called "reach-in" searches would seem to qualify as among the least invasive of the strip searches, at least in terms of exposing the searchee's nudity. A "reach-in" search, at least as described by the three dissent-

ing judges in *Paulino,* might, moreover, represent nothing more invasive than the far end of the routine search incident continuum and not even qualify as a strip search requiring some incremental justification. "Reach-in" searches may, indeed, flitter back and forth between the two larger categories on an *ad hoc* basis, as one of them most assuredly did in *Paulino* by a vote of four judges to three. In no event, however, does the so-called "reach-in" search qualify as a legally cognizable category of its own. It's a convenient descriptive term, and that's it.

## B. The Visual Body Cavity Search:

At the far end of the strip search continuum, the same categorical inclusiveness of the strip search should also almost certainly prevail. The so-called visual body cavity search does not involve the police probing into such a cavity. It involves only the careful scrutiny of the mouth of such a cavity, just as the searcher should carefully scrutinize every other inch of the naked human body in the course of a thorough strip search. The generative purpose of a strip search, after all, is to determine if drugs (or some other possible objects of the search) are hidden somewhere on or in the body of the searchee. The examination, therefore, should not be nonchalant or one that discreetly looks away. If a plastic baggy or other suspicious object is seen protruding from the mouth of the anus or the vagina, it may, of course, be seized, precisely as it could be seized if seen protruding from the teeth or the nostrils of the searchee. The searchee may unquestionably be ordered to unclench the fist to see what may be hidden therein or to lift the arms so as to reveal what might be tightly pressed under the armpits. One may be ordered to lift the breast to see if an object lies hidden in its crease or to spread the legs to make sure that an object of the search is not obscured between legs pressed tightly together. Bending and squatting is simply part of the same drill. All of this is an integral part of the strip search itself. *See DaVee v. Mathis,* 812 S.W.2d 816, 826 (Mo.App.1991) ("The body cavity search in this case was essentially a thorough strip search.").

The genitalia are not exempt. They are an integral part of the body that is being searched. It would be a poor search that ignored them. Discreetly to avert one's glance could qualify as investigative misfeasance. As the searchee stands naked in front of the examiner in a routine strip search, the male genitalia are fully exposed. If a timid male were to stand with his hands covering his genitalia, he may be ordered to remove them so as not to obstruct the view. That order would not ratchet the search upward onto a higher level requiring some greater justification. By the same token, it can hardly be maintained that the scrutiny of the female genitalia requires a higher level of Fourth Amendment justification than does the scrutiny of the male genitalia. Such a gender discrimination would almost certainly raise the hackles of the Equal Protection Clause of the Fourteenth Amendment or of the Maryland Equal Rights Amendment. *Cf. Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1273–74 (7th Cir.1983).

The so-called visual body cavity search telescopes neatly into the category of the strip search generally, albeit at the far end of the intrusiveness continuum. The strip search can conveniently and comfortably embrace both the so-called "reach-in" search at one end of the continuum and the so-called visual body cavity search at the other end. *See Bell v. Wolfish,* 441 U.S. at 558, 99 S.Ct. 1861 *("Inmates ... are required to expose their body cavities for visual inspection as a part of a strip search.")* (Emphasis supplied); *Sandin v. Conner,* 515 U.S. 472, 475, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) ("[T]he officer subjected Conner to *a strip search, complete with an inspection of the rectal area."*) (Emphasis supplied). William of Occam would assuredly applaud our disinclination to multiply unnecessarily the categories of required explanation.

### The Manual Body Cavity Search

As we move on in our analysis to the so-called manual body cavity search, we may, by contrast, be crossing a doctrinal boundary line. We are not here talking about an investigator's spreading the cheeks of a recalcitrant searchee's buttocks

because the uncooperative suspect stubbornly refuses to perform that operation for himself. Nor are we talking about reaching down and retrieving a suspicious object protruding from an anal or vaginal cavity. That is not a search at all. That is simply a permissible seizure under the Plain View Doctrine.

When, however, what is being contemplated is an actual probing into the anal or the vaginal cavity, the type of thing that should ordinarily be done by a medically trained gynecologist or proctologist, we have moved up onto an entirely different plateau of invasiveness and of required justification. We are in the area of medical, or at least quasi-medical, examinations represented by such cases as *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). Generally, this is the area in which the search for evidence involves an intrusion, by needle or scalpel, beneath the surface of the body, a subcutaneous invasion into the interior of the body. This level or category of searching we will look at briefly, *infra.* It is the special category wherein the required justification is, absent exigent circumstances, a judicially issued warrant or court order. This is a level of searching, moreover, that goes beyond concerns about privacy and embarrassment. The special modality concerns involve such things as the hygienic conditions of the searching environment and the required medical training of the personnel who will be making the examination. See *Safford Unified School District v. Redding,* 557 U.S. ——, 129 S.Ct. 2633, 174 L.Ed.2d 354, 373 n. 3 (concurring and dissenting opinion of Thomas, J.) (2009) ("The Court has adopted a different standard for searches involving an 'intrusion into the human body.' *Schmerber v. California* ... The search here does not implicate the Court's cases governing bodily intrusions, however, because it did not involve a 'physical intrusion, penetrating beneath the skin.' ").

To the extent to which, therefore, a probing of an anal or vaginal cavity would be of a type normally entrusted only to a gynecologist or proctologist, or perhaps to a trained nurse, we

believe the special hygienic and medical concerns would elevate such a search into this medical or quasi-medical searching category. In any event, the manual body cavity search does not necessitate a legally cognizable category of its own. The so-called manual body cavity search either makes it into the medical search category or it remains at the far end of the strip search category. We will not proliferate unnecessarily.

### The Medical Probe For Evidence

The medical probe for evidence is truly *sui generis.* There were harbingers even before the Fourth Amendment entered the field. *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and *Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957), were decided pursuant to the Due Process Clause of the Fourteenth Amendment because *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), had not yet made the Exclusionary Rule applicable to the states as a way of enforcing the Fourth Amendment.

Having information that Rochin was selling narcotics, deputy sheriffs went to his bedroom to arrest him. On the nightstand were sitting two capsules. When asked, "Whose stuff is this?," Rochin seized the capsules and swallowed them. After unsuccessfully jumping on Rochin and trying to extract the capsules from his mouth, the sheriffs handcuffed him and took him to a hospital. At their direction, a doctor forced an emetic solution through a tube and into Rochin's stomach. That "stomach pumping" induced vomiting and the two capsules thus produced were proved to contain morphine. A significant fact is that there was neither a warrant nor a court order for the stomach pumping. The Supreme Court reversed the ensuing conviction, finding that the "conduct ... shocks the conscience" and that "the forcible extraction of his stomach's contents" was a method "too close to the rack and the screw to permit of constitutional differentiation." 342 U.S. at 172, 72 S.Ct. 205.

*Breithaupt v. Abram,* albeit also a due process case, presaged *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16

L.Ed.2d 908 (1966), by putting the due process stamp of approval on a blood test for blood alcohol content.

In *Schmerber*, the defendant, who was subsequently convicted of driving under the influence of alcohol, was arrested at a hospital while receiving treatment for injuries suffered in an accident involving the automobile that he had been driving. At the direction of a police officer, a physician drew a blood sample which revealed that Schmerber had, indeed, been under the influence. The Supreme Court addressed a Fourth Amendment issue of first impression: "Because we are dealing with intrusion into the human body ... we write on a clean slate." 384 U.S. at 767–68, 86 S.Ct. 1826. The facts had clearly established probable cause to arrest Schmerber for driving under the influence. A search incident would routinely follow. Some further justification would be required, however, to authorize the intrusion into Schmerber's body for evidence of his guilt.

> *Whatever the validity of these considerations in general, they have little applicability with respect to searches involving intrusions beyond the body's surface.* The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.

384 U.S. at 769–70, 86 S.Ct. 1826 (emphasis supplied).

The most significant principle established by *Schmerber*, 384 U.S. at 770, 86 S.Ct. 1826, was that the determination of whether there is proper justification to intrude into the human body is, ordinarily, one that should be made by a judge and not by a police officer.

Although the facts which established probable cause to arrest in this case also suggested the required relevance and likely success of a test of petitioner's blood for alcohol, *the question remains whether the arresting officer was*

*permitted to draw these inferences himself, or was required instead to procure a warrant before proceeding with the test.* Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, *no less could be required where intrusions into the human body are concerned.* The requirement that a warrant be obtained is a requirement that the inferences to support the search "be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great.*

(Emphasis supplied).

■ Ordinarily, therefore, the justification for a medical intrusion into the human body requires a judicially issued warrant or court order. As a recognized exception to the warrant requirement, however, exigent circumstances by virtue of the imminent disappearance of highly evanescent evidence (the metabolism of the alcohol) will serve to forgive the warrant requirement.

The officer in the present case, however, might reasonably have believed that he was confronted with an emergency, in which *the delay necessary to obtain a warrant,* under the circumstances, *threatened "the destruction of evidence."* We are told that *the percentage of alcohol in the blood begins to diminish shortly after drinking stops as the body functions to eliminate it from the system.* Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, *there was no time to seek out a magistrate and secure a warrant.* Given these special facts, we conclude that *the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.*

384 U.S. at 770–71, 86 S.Ct. 1826 (emphasis supplied).

*Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), provides an indispensable gloss upon *Schmerber. Win-*

*ston v. Lee* dealt with a far more serious intrusion into the human body, one that was ultimately held to be unconstitutional. It involved "a surgical procedure under a general anesthetic for removal of a bullet lodged in [Lee's] chest." It had been clearly shown that "the bullet [would] provide evidence of [Lee's] guilt or innocence." 470 U.S. at 755, 105 S.Ct. 1611.

■ When highly intrusive procedures into the human body may pose a threat to the suspect's life or health, the ordinary justification for a more intrusive search will not necessarily suffice. The balancing process must also take into consideration the degree of medical risk and also the relative importance of the evidence to the State's case. Justice Brennan's opinion explained:

> *A compelled surgical intrusion into an individual's body* for evidence, however, *implicates expectations of privacy and security of such magnitude that the intrusion may be "unreasonable" even if likely to produce evidence of a crime.*
>
> . . . .
>
> The reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure. In a given case, the question whether the community's need for evidence outweighs the substantial privacy interests at stake is a delicate one admitting of few categorical answers.

*Id.* at 759–60, 105 S.Ct. 1611 (emphasis supplied).

In *Winston v. Lee,* the original assessment of risk was that the bullet was believed to be located "just beneath the skin," that the surgery would require an incision of "slightly more than one-half inch," and "could be performed under local anesthesia, and would result in no danger on the basis that there's no general anesthesia employed." *Id.* at 756, 105 S.Ct. 1611. On the basis of that assessment, the state trial judge granted the motion to compel surgery. *Id.* at 757, 105 S.Ct.

1611. Subsequent examination, however, showed that the risk of surgery would be significantly greater.

> The X rays revealed that *the bullet was in fact lodged two and one-half to three centimeters* (approximately one inch) *deep in muscular tissue in respondent's chest,* substantially deeper than had been thought when the state court granted the motion to compel surgery. *The surgeon now believed that a general anesthetic would be desirable for medical reasons.*

*Id.* (emphasis supplied).

By the time the case got to the United States Court of Appeals for the Fourth Circuit, that subsequent assessment of the greater risk had swung the balance against the surgery, even though the justification remained precisely the same.

> The court further noted that *"the greater intrusion and the larger incisions increase the risks of infection."* Moreover, there was conflict in the testimony concerning the nature and the scope of the operation. One surgeon stated that it would take 15–20 minutes, while *another predicted the procedure could take up to two and one-half hours. The court properly took the resulting uncertainty about the medical risks into account.*

*Id.* at 764, 105 S.Ct. 1611 (emphasis supplied).

In cases involving an actual surgical intrusion into the body, such as *Winston v. Lee,* the ultimate balancing of interests goes beyond the question of warrants versus warrantless searches, and beyond the question of justification based on some level of likelihood that evidence will be found hidden in the body. There is a larger issue of whether a medical risk is worth incurring at all, no matter how great the likelihood that evidence will be found. As a part of that balancing of interests, it becomes important to know whether the evidence being sought is indispensable to the State's case or is only cumulative. In *Winston v. Lee,* 470 U.S. at 765–66, 105 S.Ct. 1611, it was held to be only cumulative.

> *The other part of the balance concerns the Commonwealth's need to intrude into respondent's body to retrieve*

*the bullet.* ... [A]ssertions of a compelling need for the bullet are hardly persuasive. The very circumstances relied on in this case to demonstrate probable cause to believe that evidence will be found tend to vitiate the Commonwealth's need to compel respondent to undergo surgery. *The Commonwealth has available substantial additional evidence that respondent was the individual who accosted Watkinson* on the night of the robbery. No party in this case suggests that Watkinson's entirely spontaneous identification of respondent at the hospital would be inadmissible. ... *The fact that the Commonwealth has available such substantial evidence of the origin of the bullet restricts the need for the Commonwealth to compel respondent to undergo the contemplated surgery.*

(Emphasis supplied).

On balance, a surgical probe for the bullet would not have been reasonable.

The medical risks of the operation, although apparently not extremely severe, are a subject of considerable dispute; the very uncertainty militates against finding the operation to be "reasonable." ... *[A]lthough the bullet may turn out to be useful* to the Commonwealth in prosecuting respondent, the *Commonwealth has failed to demonstrate a compelling need for it.*

470 U.S. at 766, 105 S.Ct. 1611 (emphasis supplied).

█ The precedential significance of *Schmerber* is its articulation of the level of justification required for a medical or quasi-medical intrusion into the human body in search of evidence. It is at this higher level of invasiveness that a judicially issued warrant or court order is required, subject only to the exigent circumstances exception to the warrant requirement when faced with the imminent disappearance of highly evanescent evidence. With or without a warrant, however, there is also the question of what level of likelihood that the evidence will be found would be required to justify the intrusion. In *United States v. Montoya de Hernandez,* 473 U.S. at 540, 105 S.Ct. 3304, the Supreme Court interpreted the

*Schmerber* test in that regard to be the presence of particularized suspicion.

> [W]e think that the words in *Schmerber* were used to indicate *the necessity for particularized suspicion that the evidence sought might be found within the body of the individual,* rather than as enunciating still a third Fourth Amendment threshold between "reasonable suspicion" and "probable cause."

(Emphasis supplied). *See United States v. Nelson,* 36 F.3d 758, 760 (8th Cir.1994).

 There are, to be sure, cases that state that a *Schmerber*-type warrant or court order must be based on probable cause. There are, on the other hand, other cases that state that such a warrant or court order must be based on reasonable particularized suspicion. The apparent conflict is not a conflict at all. It is simply the recurring problem of flawed communication. Both statements are correct, but both statements are also confusingly incomplete. The complete statement should say that a *Schmerber*-type warrant or court order must be based on probable cause to believe that the underlying crime occurred, which either 1) contains within it or 2) is then supplemented by reasonable particularized suspicion that evidence of the crime will be found in the body of the suspect. It is just an instance of an apparent legal problem turning out to be a linguistic problem.

It is also significant to note that substantively the justifications for a medical or quasi-medical intrusion into the body in search of evidence, on the one hand, and a routine strip search for evidence, on the other hand, are exactly the same. Each requires 1) probable cause to believe that the underlying crime has been committed and 2) a particularized reasonable belief that evidence of the crime will be found on (or in) the body of the suspect. The difference between the two justifications is the designation of the party who must make the assessment and ultimate determination. For the warrantless strip search, the decision may be made by a police officer. For the more invasive intrusion into the body, the decision

must be made by a neutral and detached judicial figure, except under exigent circumstances. For the more invasive intrusion into the body, moreover, there is sometimes the further and more nuanced balancing that is entrusted to the neutral and detached judicial authority. The substantive basis, however, remains the same.

At this significantly more intrusive level, there are a number of factors entering into the balancing totality that do not enter into the reasonableness determination of a more routine strip search. Even the *Rochin v. California* stomach pump, which would not be permitted under any circumstances to recovery a lottery slip, might well be permitted to recover a ransom note revealing the location of the kidnapped infant who might die within hours without an insulin shot. All else being equal, a probe for a bullet visible under the single layer of the epidermis would almost certainly be deemed reasonable whereas the recovery of the same bullet lodged close to the heart or to the spinal column would be unquestionably unreasonable.

One other small enclave of searching that has also called for special balancing beyond the ordinary procedural requirements is that of school searches, as represented by the recent Supreme Court decision of *Safford v. Redding,* 557 U.S. ——, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009). Its pertinence is very peripheral in that it was a § 1983 constitutional tort action in which a 13–year–old student sued school authorities for subjecting her to a search in which she was required 1) to pull her bra out and to the side and to shake it and 2) to pull out the elastic on her underpants. The Supreme Court held the search to have been unconstitutional.

The search was not executed by the police, however, but by a vice-principal and a school nurse. It was in pursuit not of evidence of a crime but of a violation of a school regulation. It was neither pursuant to a warrant nor pursuant to a search incident to lawful arrest. The Supreme Court, however, held that a reasonable suspicion standard, rather than a probable cause standard, would ordinarily suffice, even in the absence

of an underlying search incident (with its built-in probable cause that a crime had occurred).

In *T.L.O*, we recognized that *the school setting "requires some modification of the level of suspicion* of illicit activity *needed to justify a search,"* and held that for searches by school officials "a careful balancing of governmental and private interests suggests that *the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause." We have thus applied a standard of reasonable suspicion to determine the legality of a school administrator's search of a student,* and have held that a school search "will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively illustrative in light of the age and sex of the student and the nature of the infraction."

—— U.S. at ——, 129 S.Ct. at 2639, 174 L.Ed.2d at 361 (emphasis supplied). That *Terry*-level of reasonable suspicion "was enough to justify a search of Savana's backpack and outer clothing." *Id.* at ——, 129 S.Ct. at 2641, 174 L.Ed.2d at 363. What was lacking was particularization. "[W]hat was missing from the suspected facts ... was ... any reason to suppose that Savana was carrying pills in her underwear." *Id.* at ——, 129 S.Ct. at 2642–43, 174 L.Ed.2d at 365.

Entering into the special balancing, moreover, is the more than ordinary vulnerability of an adolescent in a school environment to such a search.

The reasonableness of her expectation (required by the Fourth Amendment standard) is indicated by *the consistent experiences of other young people* similarly searched, *whose adolescent vulnerability intensifies the patent intrusiveness of the exposure.*

*Id.* at ——, 129 S.Ct. at 2641, 174 L.Ed.2d at 364 (emphasis supplied).

A second major factor in the special balancing was the lack of any major significance of the offense itself.

Wilson [the principal] knew beforehand that *the pills were prescription-strength ibuprofen and over-the-counter naproxen,* common pain relievers *equivalent to two Advil,* or *one Aleve.* He must have been aware of *the nature and limited threat of the specific drugs he was searching for,* and while just about anything can be taken in quantities that will do real harm, Wilson had no reason to suspect that large amounts of the drugs were being passed around, or that individual students were receiving great numbers of pills.

*Id.* at ——, 129 S.Ct. at 2642, 174 L.Ed.2d at 364–65 (emphasis supplied).

The Supreme Court clearly distinguished the Advil and Aleve equivalents in the case before it from narcotic drugs. "But nondangerous school contraband does not raise the specter of stashes in intimate places." *Id.* at ——, 129 S.Ct. at 2642, 174 L.Ed.2d at 365. It did not suggest how the balance might come out differently if such specters had been raised. *See also New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).

Such considerations, however, do not by and large roil the waters of the more routine strip search. We can, therefore, effectively factor this category of caselaw out of the routine strip search analysis.

### The Troubled Relationship Between the Strip Search And the Search Incident to Lawful Arrest

There is a symbiotic relationship between the warrantless strip search and the warrantless search incident to lawful arrest. With the rare exception of a case such as *Moore v. State,* 195 Md.App. 695, 7 A.3d 617 (2010), which involved an actual warrant for the search of a person, it is the search incident to lawful arrest that is almost always the launching pad for a strip search. Despite the close relationship between the two phenomena, it is ironically the unusual laxness in the requirements for a valid search incident that has given rise to the law's major problems in coming to grips with the requirements for a valid strip search.

The unique role of the search incident as the predicate for a strip search follows from the search incident's special place among the exceptions to the warrant requirement. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), sets out the basic relationship between the warrant requirement and its "jealously guarded" exceptions:

> Over and over again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes, and that *searches conducted outside the judicial process,* without prior approval by judge or magistrate, *are per se unreasonable* under the Fourth Amendment—*subject only to a few specifically established and well delineated exceptions.*

(Emphasis supplied).

 Of those "specifically established and well delineated exceptions," it is only the search incident, the oldest and most significant of the exceptions, that could give rise to a warrantless strip search. The second of the exceptions, the *Carroll* Doctrine, only authorizes warrantless searches of vehicles or containers and not of persons. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). The "hot pursuit" or "exigent circumstances" exception generally validates only the warrantless crossing of a threshold. *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). A stop and frisk can authorize nothing more extensive than a pat-down of the exterior of the clothing surface. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). The Plain View Doctrine authorizes no search of any sort. It is exclusively a doctrine authorizing warrantless seizures. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The last of the recognized exceptions, consent, is something in the total control of the consenting party. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). It is only a search incident that could progress directly into a strip search.

■ The justification for a search incident gives the strip search a good running head start in terms of its justification. The fact of a lawful arrest, either pursuant to an arrest warrant or warrantlessly, provides the probable cause to believe that the subject of the ultimate strip search committed the underlying crime. It is beyond that point that the search incident frequently falls short as an effective launching pad for a strip search. In addition to probable cause that the underlying crime occurred, the strip search requires particularized suspicion that evidence of that crime will be found on or in the body of the arrestee. The predicate search incident, however, does not necessarily provide that particularization. It may but it need not. The fault, if it may be called that, lies in *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), and *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973).

### The Bright Line Formula As An Exemption From Particularization

■ Whenever the police make a lawful custodial arrest of an individual, they are traditionally permitted to make a thorough search of that individual as an automatic incident of that arrest. The double-barreled purpose of the search incident was first recognized and expressed by Judge (future Justice) Benjamin Cardozo for the New York Court of Appeals in *People v. Chiagles*, 237 N.Y. 193, 142 N.E. 583 (1923). One of the purposes was to discover and seize any weapon that might be used to harm the arresting officer or others. The parallel purpose was to prevent the arrestee from destroying possible evidence. The Supreme Court described the twin purposes of the search incident in *Agnello v. United States*, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145 (1925):

*The right* without a search warrant contemporaneously *to search persons lawfully arrested* while committing crime and to search the place where the arrest is made *in order to find and seize things connected with the crime* as its fruits or as the means by which it was committed, *as well as*

*weapons* and other things to effect an escape from custody, *is not to be doubted.*

(Emphasis supplied).

The seminal case on search incident law is *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). It also explained the time-honored dual purpose of the search incident.

> When an arrest is made, *it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use* in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. *In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.*

395 U.S. at 762–63, 89 S.Ct. 2034 (emphasis supplied).

Until 1973, however, one aspect of search incident law was uncertain. In order to undertake a search incident in pursuit of either or both of those purposes, should the police be required to particularize some reason to believe that weapons or destructible evidence might actually be present on the arrestee (or within his reach, lunge, or grasp)? In *United States v. Robinson,* for instance, Robinson was arrested for driving on a revoked license. In *Gustafson v. Florida,* Gustafson was arrested for driving without a license. In each case, a search incident produced narcotics. In both cases, the defendants claimed that the searches were unreasonable because there was no conceivable evidence that could even have existed for such a crime, let alone evidence that could be destroyed, and there was no particularized reason given why the police expected that weapons were present on the arrestee.

The Supreme Court held in *Robinson* that because the exigencies giving rise to the search incident exception generally exist, that statistically likely exigency will serve, as an easily administered rule, to justify a search incident on an automatic basis. The Court opted for a bright-line formula rather than require an *ad hoc* showing of an exigency on a

case-by-case basis. Because the justification is present most of the time, it will arbitrarily be treated as if it were present all of the time. Justice Rehnquist, 414 U.S. at 235, 94 S.Ct. 467, wrote for the Court:

> *[O]ur more fundamental disagreement with* the Court of Appeals rises from *its suggestion that there must be litigated in each case the issue of whether or not there was present one of the reasons supporting the authority for a search of the person incident to a lawful arrest. We do not think the long line of authorities* of this Court dating back to *Weeks,* or what we can glean from the history of practice in this country and in England, *requires such a case-by-case adjudication.* A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the *Fourth Amendment* does not require to be broken down in each instance into an analysis of each step in the search. *The authority to search the person incident to a lawful custodial arrest,* while based upon the need to disarm and to discover evidence, *does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect.* A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the *Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search,* and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the *Fourth Amendment* but is also a "reasonable" search under that Amendment.

(Emphasis supplied).

■ The search incident to arrest, therefore, need not be justified by any particularized suspicion that evidence will be found on or in the body of the arrestee. The probable cause

to arrest may, of course, contain such particularization within it, but if it does, that will be a purely coincidental bonus.

## The Key to the Enigma Was Particularization

As strip search law began to develop, it ran down a number of false trails. The common denominator of the flawed analyses was the failure to recognize particularized reasonable suspicion as the *sine qua non* for a valid strip search. Early on, the question was frequently posed as, "Does a search incident include the right to conduct a strip search?" We looked for precedents and, perplexingly, the precedents seemed to say, "Sometimes 'Yes' and sometimes 'No.'" The search incident did nothing consistently and automatically. The explanation lay deeper. The key to unlocking the puzzle only came with the recognition of the critical role played by particularized suspicion.

Another totally fruitless line of inquiry tried to assess the gravity of the offense for which the arrest was made. Might not a search incident to an arrest for the grievous felony of first-degree murder, for example, permit a strip search, whereas a search incident to an arrest for a rinky-dink misdemeanor such as driving on a revoked license might not? That also turned out to be meaningless distinction. An arrest for a minor misdemeanor might readily be accompanied by or supplemented by particularized suspicion that drugs might be found on or in the body, whereas an arrest for first-degree murder or for high treason could be totally bereft of such particularized suspicion. The seriousness of the crime has nothing to do with the presence of adequate particularization. We were looking in the wrong direction. In this detour into misdirection, even *stare decisis* was not without its share of blame. During periods of generalized groping, there is the temptation to treat confused opinions as authoritative oracles. We repeat, and even compound, last year's flawed analysis.

The analyses began to inch closer to the mark, without quite knowing why, when they asked whether a search incident to a lawful arrest for a narcotics-related crime might justify a strip

search. Close, but no cigar! Those analyses still failed to zoom in on the precisely calibrated question. A narcotics-related arrest of a high executive of a major drug cartel, but one who scrupulously avoided contact with compromising contraband, would probably not be adequate justification for a strip search, whereas the arrest of a low-level drug courier or "mule" might well be. In neither case, however, would the answer be automatic. Search-specific particularization is required on an *ad hoc* basis.

The probable cause for the arrest that gives rise to a search incident may contain within it no particularized suspicion for a strip search at all. The State, to provide justification for a strip search in such a case, must then begin at Square One. The probable cause to arrest may, on the other hand, contain more than enough particularization, so that nothing further is required. Yet again, the probable cause may contain some particularization but not enough, so that supplementary particularization will be necessary. Nothing is automatic. It is totally *ad hoc*.

The troubled relationship stemmed from the fact that a search incident does not require a search-specific particularization, but a strip search does. If in 1973, *United States v. Robinson* and *Gustafson v. Florida* had not been decided as they were, far more by way of particularization might have, of necessity, been built into the justification for a search incident and any remaining particularization problems might have been significantly more minimal. That, however, did not happen, and particularization must be independently established.

### Particularized Suspicion As the "Open Sesame"

In *State v. Nieves*, 383 Md. 573, 861 A.2d 62 (2004), the Court of Appeals, speaking through Judge Battaglia, hedged a little because of the relatively innocuous nature of the traffic offense for which Nieves had been arrested, but nonetheless indicated that reasonable particularized suspicion is the required justification for a strip search.

[B]ased upon our own jurisprudence and utilizing the experience and analyses of many other courts addressing the reasonableness of strip searches, *we hold that the reasonable, articulable suspicion standard applies in the strip search incident to arrest context.*

383 Md. at 596, 861 A.2d 62 (emphasis supplied).

Judge Battaglia also made it clear that the level of suspicion referred to was the reasonable articulable suspicion level established by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968):

Insofar as the standard to evaluate reasonableness, *our jurisprudence is replete with the use of "reasonable, articulable suspicion"* to determine the reasonableness of searches conducted in other contexts. *See Ransome,* 373 Md. at 106–07, 816 A.2d at 905 (applying *the reasonable, articulable suspicion standard* that the arrestee was concealing weapons or evidence *to evaluate the reasonableness of a Terry frisk)* [.]

*Id.* (emphasis supplied).

In *Nieves,* the underlying arrest had been for driving a truck without having a valid driver's license. It, therefore, contained no particularized suspicion that Nieves was in possession of contraband drugs. The strip search was held to have been unreasonable because of the lack of any particularization aimed at Nieves.

The circumstances surrounding another person cannot be imputed to the person who is the subject of the search because *the inquiry must be particularized* and objectively *based upon the person suspected of carrying weapons or contraband.*

383 Md. at 598, 861 A.2d 62 (emphasis supplied).

When *Nieves v. State,* 160 Md.App. 647, 666, 866 A.2d 870 (2004), was decided by this Court, Judge Thieme clearly stated the "individualized suspicion" standard:

> *A strip search is permissible only if the official has an individualized suspicion* that an arrestee is hiding weapons or contraband. *This suspicion must relate to the "individual," not a "category of offenders,"* such as drug users.

(Emphasis supplied).

Although the bottom line in *Stokeling v. State,* 189 Md.App. 653, 667, 985 A.2d 175 (2009), was that a strip search, albeit intended, did not ultimately take place, Judge Deborah Eyler's legal analysis utilized the "reasonable, articulable suspicion" standard.

> Here, *reasonable, articulable suspicion that the appellant was in possession of illegal narcotics* in turn raised reasonable, articulable suspicion that he was in possession of a firearm.

(Emphasis supplied).

*Stokeling* is a good teaching vehicle. In contending with an extended chain of events, it cleanly wraps each stage of the analysis up before moving on to the next. Each distinct phase of the analysis, moreover, is placed under a clearly demarcated sub-heading. The reader does not have to guess where he is. Its strip search analysis dealt with a hypothetical strip search that aborted before it ever took place.

> After Officer Webster and the appellant arrived in the booking area of the police station, but *before the search began, the appellant* announced that he had "weed" in his crotch area and that that probably was a violation of his parole. He then *"reached down in the front of his pants and pulled out a clear baggie of suspected marijuana." (No strip search was performed.)*

189 Md.App. at 659, 985 A.2d 175 (emphasis supplied). As Judge Eyler observed, 189 Md.App. at 673 n. 8, 985 A.2d 175:

> We note that the appellant at times refers to his experience at the police station as a "strip search." ... Here, the suppression hearing evidence established that *no strip*

*search was performed. The appellant reached in his pants, removed the baggie of marijuana, and turned it over to the police.*

(Emphasis supplied).

For our present purposes, *Stokeling* is a textbook example of when a strip search (in this case a hypothetical one) is fully justified by the predicate search incident itself, with no supplemental particularization needing to be shown. All the particularization that was necessary was neatly contained within the probable cause for the arrest itself. In the *Stokeling* case, a lawful traffic stop was timely followed by a K–9 alert that drugs were probably in the vehicle that had been occupied by Stokeling, another passenger, and the driver. The ensuing *Carroll* Doctrine search of the vehicle revealed marijuana residue on the front-seat console, next to where Stokeling had been sitting. Stokeling was removed from the vehicle as part of a *Terry* stop, which was followed by a *Terry* frisk for weapons. It was in the course of that frisk that much of the probable cause developed for Stokeling's ultimate arrest.

Officer Fanning removed the appellant from the Chrysler and "patted him down for weapons...." As he did so, he noticed that *the appellant "was shaking quite a lot[.]"* The officer asked him "why he was so nervous, why he was shaking." In response, the appellant said "it was cold out." Actually, the outside temperature was between 75 and 80 degrees.

*... During this pat-down, Officer Fanning "noticed that there was something large" that felt to him "like a bag of something in [the appellant's] crotch area."* Officer Fanning had some difficulty patting the appellant down in that area because *the appellant "wouldn't spread his legs completely apart."* Officer Fanning did not attempt to remove the bag at that time because, as he put it, "I wasn't positive and I'm not going to stick my hands down somebody's pants in front of the 7–Eleven unless I strongly believe it's a

weapon or a gun, but I knew it not to be a gun or a knife." No weapons were found in the pat-down.

*Id.* at 658–59, 985 A.2d 175 (emphasis supplied).

Stokeling was subsequently arrested for the possession of drugs. Judge Eyler summarized the probable cause for that lawful warrantless arrest.

*During the pat-down, the appellant resisted moving his legs apart to accommodate Officer Fanning's frisk for weapons.* And, *in the course of frisking the appellant's crotch area for weapons, the officer felt a large "bag of something."* After the frisk, in the search of the Chrysler, *Officer Fanning "observed marijuana residue in the middle console of the vehicle* and the driver's side where you put—like the opening for maps . . . ."* These facts, together with those we have recounted in considering the *Terry* frisk issue, elevate the stop of the appellant to one supported by probable cause.

*Id.* at 670, 985 A.2d 175 (emphasis supplied).

When the officers decided that a strip search was necessary, they moved the situs of the ensuing search incident to the station house to satisfy the modality concerns of *Paulino v. State.* This Court concluded that, had the strip search actually been carried out, it would have been fully justified.

*By the time a strip search would have been carried out,* however, *the officers had probable cause to believe the appellant was in possession of drugs on his body* based upon the total facts, including the presence of a bag of "something" in his crotch area.

*Id.* at 669–70, 985 A.2d 175 (emphasis supplied).

The particularization for the strip search and the probable cause for the arrest were one and the same.

*It was fair* for Officer Fanning *to infer,* from the presence of a large bag of something in the appellant's crotch area, which is not an ordinary means people use to carry goods, *that the bag contained illegal contraband and that the*

*appellant was attempting to conceal* it by keeping his legs together during the pat-down.

*Id.* at 672, 985 A.2d 175 (emphasis supplied).

In terms of justifying a strip search, actual or hypothetical, that particular (and particularized) bundle of probable cause needed no supplementation. That does not mean, of course, that any search incident to an arrest for possession CDS would justify a strip search. It means only that that particular search incident, on the facts of that case, happened to do so.

As the national caselaw begins to gel with respect to strip searches, the presence of particularized suspicion as the required justification is gaining wide acceptance. See, *e.g.,* *Swain v. Spinney,* 117 F.3d 1, 5 (1st Cir.1997) (stating that police must have a "reasonable suspicion" that evidence will be found before conducting a strip search); *Kennedy v. Los Angeles Police Dep't,* 901 F.2d 702, 716 (9th Cir.1989); *Archuleta v. Wagner,* 523 F.3d 1278, 1284 (10th Cir.2008) ("We have articulated two primary concerns in determining whether a strip search is reasonable for the purposes of the Fourth Amendment: ... whether there is a reasonable suspicion that the detainee has concealed weapons, drugs, or contraband."); *Cuesta v. School Board of Miami–Dade County,* 285 F.3d 962, 969–70 (11th Cir.2002); *Sarnicola v. County of Westchester,* 229 F.Supp.2d 259, 270 (S.D.N.Y.2002) ("[T]his Court recently opined that the Court of Appeals would apply the particularized reasonable suspicion test to [strip] searches of felony arrestees as well."); *State v. Jenkins,* 82 Conn.App. 111, 842 A.2d 1148, 1156 (2004) ("Accordingly, we adopt the reasonable suspicion standard for strip searches incident to a lawful felony arrest.").

## Particularization in the Present Case

■ We have no difficulty in holding that the particularized suspicion standard for a strip search was satisfied in this case. The basic search was incident to the appellee's arrest for the possession of contraband drugs. Much of the necessary particularized suspicion that the appellee had drugs

hidden on or in his person was already part and parcel of the probable cause for his arrest. It began with information from a "very reliable informant," whom the police had been using for five or six months and who had provided reliable information in other cases that had "led to numerous CDS arrests and search warrants." The informant reported that the appellee was selling crack cocaine out of a blue Audi in the Towson and Parkville area.

Another detective in the same unit stated that he had received a complaint two or three months earlier that a man named Harding was selling crack cocaine at a liquor store on Perring Parkway and McClean Boulevard. Both reports, significantly, identified the appellee as a seller of narcotics and not as a user. That is a factor in the hiding of one's stash on or in the body.

When the police first approached the appellee on September 10, 2009, he was in the neighborhood described in both reports and was driving the blue Audi precisely described, with license tag number, by the confidential informant. The appellee, moreover, was the only person in the car. The final catalyst for the appellee's arrest was the alert by the drug-sniffing canine, Aaron. Aaron alerted twice on the car. Once was at the driver's side front door. The appellee had been the driver. The second alert was on the driver's seat. That was where the appellee had just been sitting. At that point, the appellee was lawfully arrested.

The totality of circumstances entering into the probable cause for that arrest contained much particularized suspicion that the appellee may have been concealing drugs on his person. It is not necessary in this case, however, to make a decision on the basis of what was known to the police at that precise moment of his arrest. By way of supplementation, a routine search incident of the appellee's pockets produced $1,474 in cash. That was by no means dispositive that the appellee was selling drugs, but it was nonetheless compatible with that possibility.

By way of further supplementation, Detective Hearn testified at the suppression hearing that he "had reasonable suspicion [the appellee] had more CDS on him and we needed a further search." Adverting to his own experience, he stated:

My five years as a detective in the CDVIT Unit has made me learn that drug dealers a lot of times would store drugs in their pocket or pants leg and conceal drugs. It takes more than a cursory search to find various items most of the time.

In *Moore v. State, supra,* Judge Kenney told us that the "training, knowledge and experience" of veteran narcotics investigators should not be ignored, adding:

*[i]t is well known in the law enforcement community,* and probably to the public at large, *that persons in possession of illegal drugs* and associated paraphernalia *often secrete them in body cavities to avoid detection.*

(Emphasis supplied).

An additional and major supplemental factor was the process of elimination. The K–9 alert established probable cause that the appellee was in possession of CDS. We would acknowledge, however, that that was not necessarily particularized suspicion that the drugs were hidden on or in his body. The K–9 alert may only have established constructive possession and not direct possession. Had there been other passengers in the car, the appellee could have been in constructive possession or even joint constructive possession of drugs directly possessed by other passengers. In this case, however, there were no other passengers. The appellee, as driver, could have been in constructive possession of CDS in the glove compartment, in the trunk, on the backseat, or on the back window ledge. The appellee could even have been in direct possession of CDS in the pockets of his clothing, and particularized justification for a strip search might not be established until that less intrusive possibility had been eliminated.

In this case, however, the process of elimination moved inexorably forward toward particularization. The pinpointing of location by both K–9 alerts focused upon the appellee and

away from the farther reaches of the car. The painstakingly *Carroll* Doctrine search of the Audi eliminated it as the locus of the CDS. The initial and routine search incident of the appellee eliminated his pockets as the sinister situs. The K–9 alert had established that CDS was, in all probability, somewhere in the car proper or on the person of someone in the case. At each elimination of an alternate hiding place, the odds in favor of the appellee's body went up exponentially. As Judge Kenney told us in *Moore v. State, supra:*

> *When a search of the vehicle* from which appellant was known to distribute drugs *and a search of his outer clothing did not reveal any drugs, it followed that a strip search* followed by a visual body cavity search *were logical and reasonable next steps.*

(Emphasis supplied). Q.E.D. We cannot imagine how more particularized the suspicion in this case could have been.

### The Strip Search In a Nutshell

 With scattered bits and pieces of caselaw and loose strands of analysis pulled in from all points of the compass, this small corner of the Fourth Amendment is rapidly degenerating into a hopeless analytic muddle. With the extraneous underbrush swept away, however, the picture becomes amazingly clear. We are dealing with a single phenomenon called a strip search. Starting with a good search incident, all that is required is particularized suspicion that drugs may be hidden on or in the body of the suspect, and with that, the strip search, so far as its justification is concerned, is reasonable.

As our earlier mandate provided, the suppression order is reversed and the case is remanded for a trial on the merits.

**SUPPRESSION ORDER REVERSED AND CASE REMANDED FOR TRIAL ON THE MERITS; COSTS TO BE PAID BY APPELLEE.**

Judge GRAEFF concurs in the judgment only.