REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2380

September Term, 2015

_____

DESHAUNE DARNELL DARLING

v.

STATE OF MARYLAND

_____

Krauser, C.J.,
Berger,
Shaw Geter,


JJ.
_____

Opinion by Shaw Geter, J.
_____

Filed:  April 27, 2017

Deshaune Darling, appellant, was convicted by a jury sitting in the Circuit Court for Dorchester County of first-degree premeditated murder; conspiracy to commit first-degree murder; second-degree murder; first-degree assault; conspiracy to commit first-degree assault; second-degree assault; wearing, carrying or transporting a handgun; use of a handgun in the commission of a felony or crime of violence; kidnapping; and conspiracy to commit kidnapping. [1] Appellant presents the following five questions on appeal, which we have slightly rephrased:

I. Did the suppression court err when it denied appellant's motion to suppress evidence seized from two motor vehicles?

II. Did the trial court err when it admitted into evidence a letter purportedly written by appellant while he was an inmate at the detention center because it was not properly authenticated?

III. Did the trial court err when it admitted into evidence a cell phone service receipt because it was not properly authenticated and constituted inadmissible hearsay?

IV. Did the trial court err when it admitted "other crimes" evidence?

V. Did the trial court err in denying appellant's motion for judgment of acquittal?

For the reasons that follow, we shall affirm.

### FACTS

The State's theory of prosecution was that appellant and an accomplice murdered Radames Guzman either in revenge for providing information about appellant to the police

---

[1] Appellant was sentenced to life imprisonment for both first-degree murder and conspiracy to commit that crime, twenty years of imprisonment for use of a handgun, and thirty years of imprisonment for kidnapping; all sentences to be served consecutively. His remaining convictions were merged for sentencing purposes.

or to prevent Guzman from testifying against appellant in a subsequent trial. The State's evidence was circumstantial and came primarily, from evidence seized from two vehicles; the decomposed body of Guzman; and the testimony of Jessie Jo Stewart, a drug addict who bought drugs from appellant. The defense's theory was that Stewart, killed Guzman to curry favor with appellant. The defense presented no testimonial evidence.

In the summer of 2011, Guzman, a confidential informant for the Delaware State police, made several controlled drug buys from appellant. Based on those buys, a search warrant was issued and executed for appellant's home in Dover, Delaware. Appellant was arrested, released on bond, but then "disappeared" and failed to appear for trial.

Roughly three years later, on the night of August 2, 2014, Guzman was last seen by his family leaving his house in Delaware. About three weeks later, on August 24th, his partially decomposed and buried body was found in a wooded area near Linkwood and Red Mill Roads in Dorchester County. Guzman's wrists were bound behind his back with duct tape, and he had three gunshot wounds to the back of his head. He was identified by his fingerprints. A subsequent medical examination revealed that the cause of death was multiple gunshot wounds and the manner of death was homicide.

An investigation into Guzman's Facebook account and cell phone usage revealed that he was last in contact with a woman named Jessie Jo Stewart. The police interviewed her on September 2, but she told the police that she did not know Guzman or what had happened to him.

Two days after that interview, police set up a covert surveillance at appellant's home, located at 309 Prior Avenue in Salisbury. A van was parked in the driveway and a

2

Lexus on the street; both vehicles were associated with appellant. Police officers saw appellant leaving his home in the van. They followed him and eventually stopped the vehicle. He was taken into custody, and the van was towed to a Maryland State Police Barrack. Pursuant to a search warrant, two black ski masks and a cell phone service receipt were seized from the vehicle.

After appellant's arrest, a police canine unit made a positive alert for drugs on the Lexus. The Lexus was also towed to a Maryland State Police Barrack where it was searched pursuant to a search warrant. The executing officer observed that the car and trunk were "very clean" and noted that as soon as the door of the car and trunk were opened he was "overwhelmed" by the "strong odor of cleaning material[.]" He found what appeared to be several spots of dried blood in the trunk – on the molding, interior lid, trunk mat, and side wall. Swabs of the suspected blood were collected, pursuant to an additional search warrant obtained by the officers. DNA analysis on the swabs showed that the blood was from either Guzman or a brother based on DNA swabs taken from Guzman's mother and father.[2] DNA found on one of the ski masks matched appellant's DNA.

Stewart entered into a plea agreement with the State in which she agreed to plead guilty to a charge of kidnapping and testify truthfully at appellant's trial, and in exchange the State would recommend a sentence of eight years. Stewart testified that she was a long-time drug addict and had known appellant, who supplied her with drugs, for about a year prior to the murder. She paid for the drugs with money, if she had it, or with sex.

---

[2] Guzman's body was too decomposed to allow recovery of DNA.

Stewart testified that appellant asked her to look up Radames Guzman, who she did not know, on the internet and arrange to meet him. She found Guzman on Facebook, and they agreed to meet on the evening of August 2; she told appellant about the arrangement. Messages from Guzman's and Stewart's Facebook accounts corroborated her account and were admitted into evidence.

On August 2, appellant picked up Stewart and drove her to the Royal Farms store in Easton to obtain a car he had arranged for her to use to pick up Guzman. Once at the store, they met three people in a gold Grand Marquis. Video footage from the store's surveillance cameras was introduced into evidence. Stewart entered the Grand Marquis and drove the three occupants to a nearby house where they got out. She then drove to Delaware to meet Guzman. During the trip, she was in cell phone contact with appellant.

After picking up Guzman, she drove to a Royal Farms store in Felton, Delaware and texted appellant while she was in the bathroom. Photographs from the store's video surveillance corroborated Stewart's and Guzman's presence at the store with a Grand Marquis around 11:30 p.m. They then left the store and drove to the Cambridge area of Maryland, during which she was in cell phone contact with appellant. At some point, a car, which she later learned was appellant's Lexus, pulled up behind her on a deserted, back road and flashed its headlights. She stopped the car she was driving and got out. As she did so, she was shoved to the ground, but saw two men wearing ski masks and all black clothing. One of the men held a gun in his hands. Both of the men pulled Guzman, who was screaming, out of the car. One man hit Guzman in the face with the gun, and both men hit Guzman all over with their fists. The men duct taped Guzman's hands and ankles and

4

put him in the back seat of appellant's Lexus. The men then pulled up their masks and she recognized appellant and another man, whom she had seen before but did not know his name.

Stewart followed the Lexus to another deserted, back road where the men placed Guzman in the trunk of the Lexus. They then drove to a migrant camp where appellant sold drugs for several hours. Stewart followed appellant back to Easton where they dropped off the Grand Marquis at the house where she had earlier left the three occupants. She then got into the Lexus with appellant and the other man. Appellant drove to the Royal Farms store in Easton. Video footage from the store's surveillance cameras shows Stewart and appellant at the store around 3:00 a.m. The video footage also shows appellant pumping gas and then walking to the rear of his car where he leans over as if to listen to noise from inside of the trunk.

Appellant then drove Stewart to her home in Cambridge, during which time she heard "kicking in the trunk." Before she got out of the car, appellant asked for her cell phone, which she gave to him. Cell phone records from the number on the cell phone receipt found in the van in which appellant was arrested show that between 4:07 a.m. and 4:50 a.m., that cell phone was in the area where Guzman's body was later found. The next day Stewart went to Walmart and bought a new phone with money appellant had given her. Photographs from the Walmart surveillance video support Stewart's testimony and show her walking out of Walmart with the phone on August 3 around 7:00 a.m.

Stewart admitted that she had not been honest in her first interview with the police on September 2. She explained that she was scared -- appellant had threatened her and her

5

family. Her second interview with the police, roughly two weeks later, on September 17, was played for the jury and more closely followed her trial testimony.

Stewart's testimony was corroborated, in part, by the testimony of Tytina Williams, her boyfriend Gary Barham, and their friend Donnie Eisman. They testified that on the afternoon of August 2, they drove in Eisman's car to Salisbury, Maryland where Barham bought drugs from appellant, who was driving a Lexus. An arrangement was made to meet later so appellant could borrow Eisman's car. That night the three drove to the Royal Farms store in Easton where appellant pulled up in his Lexus with a woman inside. The woman got in the passenger seat of Eisman's car, and they drove to Barham's house. The three got out of the car, and the woman drove off. During the early morning hours of the next day, the woman drove the car back to the house. At the same time, appellant drove up in his Lexus with a man known to Barham as "Terrell" sitting in the passenger seat. The woman exited Eisman's car and got into the back seat of the Lexus, which then left.

Following appellant's arrest, he was held at the Wicomico County Detention Center. On January 21, 2015, the detention center seized a letter from the outgoing mail addressed to appellant's fiancée and signed by appellant. A scanned copy was sent to the State's Attorney's Office. An expert in the field of handwriting analysis compared exemplars of appellant's handwriting to the scanned letter and concluded that she "was virtually certain that the letter was written" by appellant. In the letter, appellant admitted that he knew Guzman and knew that he had acted as a drug informant against him. Appellant wrote that Stewart killed Guzman as a "surprise" for him and he "didn't have anything to do with it." He wrote that Stewart had asked him about borrowing someone's car to carry out the

6

surprise. Appellant made arrangements for her to borrow a friend's car, and sometime that night, she showed him her "surprise" – she opened the trunk and he saw Guzman lying inside.

We will provide additional facts as needed to address the questions raised.

## DISCUSSION

### I.

Appellant argues that the suppression court erred when it denied his motion to suppress the evidence seized from two vehicles associated with him -- a Dodge van and a Lexus sedan. Appellant makes several arguments but mostly focuses on two: the police did not possess reasonable articulable suspicion to justify the stop of the van or to engage in a canine search of the Lexus. The State disagrees, as do we.

When reviewing the denial of a motion to suppress, the record at the suppression hearing is the exclusive source of facts for our review. *State v. Rucker*, 374 Md. 199, 207 (2003). We extend great deference to the fact finding of the suppression judge and accept the facts as found, unless clearly erroneous. *Id*. (citation omitted). A factual finding cannot be clearly erroneous if there is any competent evidence to support the finding below. *Hoerauf v. State*, 178 Md. App. 292, 314 (2008) (citing *Fuge v. Fuge*, 146 Md. App. 142, 180, *cert. denied*, 372 Md. 430 (2002)). We review the evidence in the light most favorable to the prevailing party, in this case, the State. *Cartnail v. State*, 359 Md. 272, 282 (2000). Nevertheless, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Haley v. State*, 398 Md. 106, 131 (2007) (citing *Ornelas v. United States*, 517 U.S. 690 (1996)).

7

Prior to trial, appellant moved to suppress the evidence found in a Dodge van and Lexus sedan. Testifying for the State at the ensuing suppression hearing was appellant's fiancée and four police officers: Detective Jordan Banks and Deputy J.C. Richardson, Wicomico County Sheriff's Office, and Trooper Kenny Moore and Detective Sergeant Chasity Blades, Maryland State Police Department.

Around 7:00 a.m. on September 4, 2015, Detective Banks set up a covert surveillance at 306 Prior Avenue in Salisbury where appellant and his fiancée lived. Detective Banks was instructed to advise other officers in the area when appellant, who had outstanding warrants, left the home. Sometime after 9:00 a.m., Detective Banks saw appellant exit the home and drive off in the green Dodge van that had been parked in the driveway of the home.

Detective Banks maintained surveillance of the van until it was observed by Trooper Moore, who then fell in behind it. Trooper Moore testified he had been ordered to take appellant into custody based on two outstanding warrants. Trooper Moore testified that he made telephone calls the day before and that morning and confirmed that the two warrants were still valid. He testified that he did not attempt to arrest appellant at his home because of the presence of others and information that appellant may be armed.

While following the van, Trooper Moore observed the van drive 35 miles per hour in a posted 25-mile per hour zone and then 40 miles per hour in a posted 30-mile per hour zone. The trooper activated his emergency equipment, the van stopped, and the trooper pulled his police car in behind it. The trooper exited his car and when he was about halfway

8

to the van from his car, appellant "floored it" and drove off. The trooper ran back to his police car and gave pursuit.

During the ensuing 20-minute chase involving several other police officers, the van reached speeds of 20 to 30 miles per hour over the speed limit; ran stop signs and stop lights; caused damage to cars as they sought to get out of the way; crossed two median strips; and went against the flow traffic. Appellant also called 911 during the chase and said he was armed and threatened suicide. During the pursuit, Trooper Moore also observed appellant holding a black nylon holster and saw appellant's "right hand going down to his lap" while he changed positions in his seat. The chase ended when appellant stopped the van in front of a store. The police approached the van, pulled appellant from it, and arrested him. Pursuant to a search incident to arrest, drugs were recovered from appellant's person. The van was then towed to a Maryland State Police Barrack where, pursuant to a search warrant, a handgun, a holster, and several other items were seized from the van.

After appellant was arrested, Deputy Richardson was dispatched to appellant's home to perform a canine scan for narcotics of a 1997 Lexus. The deputy testified that when he arrived at 10:48 a.m., he saw Detective Sergeant Blades standing near the Lexus, which was parked on the street in front of appellant's home. Deputy Richardson's dog, Diablo, alerted to the presence of drugs at the passenger side door of the car. As a result of the positive alert, the Lexus was towed to a Maryland State Police Barrack where Trooper Moore, pursuant to a search warrant, conducted a search of the Lexus for drugs.

9

During the search, the trooper noticed what appeared to be dried blood. The trooper stopped the drug search and transferred the case to the homicide unit.

Appellant argued that the police had insufficient information to justify the stop of the van and the canine search of the Lexus. The suppression court disagreed and denied the motion to suppress as to both vehicles. Crediting the officers' testimony, the court ruled that the police were justified in stopping the van for several reasons: twice it was observed traveling over the posted speed limit; the police had a valid arrest warrant for appellant; and by calling 911 and stating he had a gun and would use it, appellant was a danger to himself and the public. As to the Lexus, the court stated that while "much [has been] made of the timing" of the canine scan and when the car was towed, the court found that the scan had been completed before it was on the tow truck because the scan report was completed at 10:48 a.m. and the tow truck left at 11:04 a.m.

**The van**

On appeal, appellant argues that the suppression court erred in denying his motion to suppress the items found in the van because the police lacked probable cause to stop the van prior to the high speed police chase.[3] Specifically, appellant argues that Trooper Moore's "pacing" of the van could not justify the stop of the van for speeding because it

---

[3] Appellant makes no argument regarding the legality of the stop of the van *after* the high speed police chase presumably because of the additional numerous traffic offenses appellant engaged in during the chase and his 911 call suggesting that he might commit suicide. *See Wilson v. State*, 409 Md. 415, 439 (2009)(holding that a police officer may stop a citizen to investigate whether that person is in apparent distress).

was not an "objective" measurement. He also argues that the two arrest warrants could not justify the stop because the Delaware "capias" [4] document was unsigned and the Dorchester County warrant was stale as it was issued in 2012. The State contends that appellant's arguments are meritless because the Fourth Amendment was not implicated – there was no seizure because, after the police initiated the traffic stop, appellant "'immediately floored it'" and fled the area.

The Fourth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, protects against unreasonable government searches and seizures. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). From its plain language, the Constitution does not forbid all searches and seizures; just unreasonable searches and seizures. *Maryland v. Buie*, 494 U.S. 325, 331 (1990). "Reasonableness" is determined by balancing "the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id*. (citations omitted).

Although a traffic stop does implicate the Fourth Amendment, no violation occurs when a law enforcement officer has probable cause to believe the vehicle stopped has violated a traffic law and the officer temporarily detains the vehicle "'to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with intent to issue a citation or warning.'" *State v. Green*, 375 Md. 595, 609 (2003)(quoting *Ferris v. State*, 355 Md. 356, 369 (1999)(citing *Whren v. United States*, 517 U.S. 806, 810 (1996))). "Probable cause" is a non-technical conception that would justify the belief by a reasonable

---

[4] A "capias" is "[a]ny of various types of writs that require an officer to take a named defendant into custody." BLACK'S LAW DICTIONARY 188 (11th ed. 2014).

11

person that a crime has been or is being committed. *Johnson v. State*, 356 Md. 498, 504-05 (1999). It requires "less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion." *Williams v. State*, 188 Md. App. 78, 90-91 (quotation marks and citations omitted), *cert. denied*, 411 Md. 742 (2009).

In *California v. Hodari D.,* 499 U.S. 621, 626 (1991), the United States Supreme Court held that a seizure requires "*either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." (emphasis in *Hodari*). Whether conduct constitutes submission to police authority depends on "the totality of the circumstances[.]" *United States v. Cortez,* 449 U.S. 411, 417 (1981). "[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin v. California,* 551 U.S. 249, 262 (2007).

Courts have held that a temporary halt of a car by the police that then drives off does not amount to a seizure. *See United States v. Baldwin*, 496 F.3d 215, 218-219 (2nd Cir. 2007)(classifying Baldwin's actions in stopping his car, when approached by a police vehicle operating its emergency equipment, but then speeding off before the officers reached his car, as a momentary stop that did not constitute submission to police authority, and therefore, Baldwin was not seized within meaning of the Fourth Amendment), *cert. denied*, 552 U.S. 1222 (2008); *United States v. Washington,* 12 F.3d 1128, 1132 (D.C.Cir.1994)(the defendant who initially stopped his car but who then drove off quickly before the officer even reached the car, was not seized within the meaning of the Fourth Amendment). We agree. Accordingly, because appellant never submitted to the assertion

12

of authority by the police when he drove off as the police were approaching the van, he was never seized, and therefore, there is no Fourth Amendment violation.

Even if we were to believe that the van was "seized" within the meaning of the Fourth Amendment when it stopped, we would find that the stop of the van was justified for two reasons. First, appellant had two outstanding warrants. Even if, as appellant alleges, the "capias" was unsigned and the Dorchester County warrant was issued in 2012, they both could justify the stop of the van because Trooper Moore testified that he called the day before and the day of the stop and confirmed that the warrants were still active. *See Ott v. State*, 325 Md. 206, 215 ("[A]n officer may make an arrest on the strength of a warrant, the existence of which has been certified to him by other officers in his department[.]"), *cert. denied*, 506 U.S. 904 (1992). Thus, we agree with the State that the stop of the van was based on probable cause, or at a minimum, on the good faith belief of Trooper Moore that the warrants for appellant's arrest were current and valid. *See United States v. Leon*, 468 U.S. 897, 922 (1984) (holding that the exclusionary rule remedy does not apply where an officer's reliance on a warrant is objectively reasonable)(citations and footnote omitted).

Second, Trooper Moore testified that he twice paced the van traveling ten miles over the speed limit in two different zones – traveling 35 miles per hour in a 25-mile per hour zone on North Division Street and 40 miles per hour in a 30-mile per hour zone on Eastern Shore Drive. *See* Md. Code Ann., Transp. Art. § 21-801.1(stating that a posted maximum speed limit is the maximum lawful speed). An officer may initiate a traffic stop, even if pretextual, when the officer has probable cause to believe that a traffic law has been

13

violated. *Whren*, 517 U.S. at 812-13, 819. This is because the "subjective motivations" for conducting a traffic stop are irrelevant for Fourth Amendment purposes. *Smith v. State*, 214 Md. App. 195, 201 (citation omitted), *cert. denied*, 436 Md. 330 (2013). Contrary to appellant's argument, "pacing" a vehicle to measure its speed is an objectively reasonable basis to determine whether a vehicle has violated traffic laws. *Cf. State v. Harding*, 196 Md. App. 384, 389 (2010) (finding "no issue" regarding the legality of a traffic stop where an officer "paced" a car traveling 50 miles per hour in a 35-mile per hour zone.), *cert. denied*, 565 U.S. 826 (2011).

### The Lexus

Although appellant's argument regarding the Lexus is at best confusing, it seems that he believes that the seizure of the Lexus was illegal, in part, because the scan occurred after the Lexus was seized and placed on the towing bed. Specifically, he argues that the suppression court's finding that Detective Richardson completed the canine scan at 10:48 a.m. was clearly erroneous.

We do not find clearly erroneous the suppression court's finding that the scan took place before it was loaded for towing for several reasons. First, Deputy Richardson testified that when he arrived to perform a canine scan of the Lexus, it was parked on the street. Second, Detective Sergeant Blades testified that she was present during the canine scan, that the tow truck was called "shortly after the scan was positive," and that the Lexus was not on "the rollback when the dog scan was done[.]" Notwithstanding the somewhat confusing testimony of Deputy Richardson that he was dispatched at 10:48 a.m., arrived at 10:48 a.m., and the detective's incident report that suggests that the scan was completed at

14

10:48 a.m., the suppression court's found that the scan took place before the Lexus was loaded on the tow truck.  Therefore, even if the suppression court was clearly erroneous in finding that Deputy Richardson completed the canine scan at 10:48 a.m., this finding was irrelevant because, the court's finding that the Lexus was placed on the tow truck after the scan was completed was not clearly erroneous.

Further, the seizure of the Lexus was valid based on the positive canine scan.  The Court of Appeals has held that a canine search of a car during a routine traffic stop is not a search or a seizure under the Fourth Amendment.  *Wilkes v. State,* 364 Md. 554, 581-82 & n.20 (2001).  The decision in *Wilkes* was based on the holdings in *United States v. Jacobsen*, 466 U.S. 109, 114 (1984)(the opening of a damaged cardboard box in which a private freight carrier employee observed a white powdery substance does not constitute a search within meaning of the Fourth Amendment) and *United States v. Place*, 462 U.S. 696, 707 (1983)(a canine "sniff" of luggage in a public place does not constitute a search within the meaning of the Fourth Amendment because the investigative technique is so narrow - the manner of the search is minimally intrusive and the content of the information revealed by the procedure is limited).  Based on the above, we hold that a canine scan of an empty car in a public area does not implicate the Fourth Amendment.  *Cf. United States v. Friend*, 50 F.3d 548, 551 (8th Cir. 1995), *vacated on other grounds*, 517 U.S. 1152 (1996)(stating that a dog sniff of a car parked on a public street or alley does not amount to a search under the Fourth Amendment); *United States v. Ludwig*, 10 F.3d 1523, 1526 (10th Cir. 1993)(holding that random and suspicionless dog sniff of vehicles in motel parking lot was not a search subject to the Fourth Amendment); *Horton v. Goose Creek*

15

*Indep. Sch. Dist.*, 690 F.2d 470, 477 (5th Cir. 1982)(stating that dog sniffs of vehicles on a public parking lot of a school are not a search within the purview of the Fourth Amendment); *Dowty v. State*, 210 S.W.3d 850, 854-55 (Ark. 2005)(dog scan of a an empty car parked in a restaurant parking lot does not amount to a search under the Fourth Amendment); *State v. McMillin*, 927 P.2d 949, 951-53 (Kan. Ct. App. 1996)(holding that the dog sniff of vehicle parked in public parking lot did not constitute a "search" under the Fourth Amendment); *State v. Garcia*, 535 N.W.2d 124, 126-27 (Wis. Ct. App. 1995)(holding that the dog sniff of the exterior of a car parked in motel parking lot is not a search under the Fourth Amendment because there is no legitimate expectation of privacy around the air space of a car in a public parking lot). Accordingly, the Fourth Amendment was not implicated during the canine scan of the Lexus, and once the dog alerted to the presence of drugs, the police had probable cause to seize and search the car. *See State v. Wallace*, 372 Md. 137, 146 (2002)(stating that the law is settled that a positive canine scan for the presence of contraband provides probable cause for a search and seizure), *cert. denied*, 540 U.S. 1140 (2004).

Additionally, throughout appellant's arguments as to both vehicles he suggests that the police used the pretext of a drug investigation to cover up for what was a homicide investigation that lacked probable cause. Whether or not the seizure of the vehicles was pretextual is not relevant because, as explained above, no Fourth Amendment violation occurred in the seizing of the vehicles. *See also Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

16

Lastly, appellant argues that the suppression court erroneously found that the police recovered 20 grams of cocaine during a search of the van. State Trooper Moore testified at the suppression hearing that drugs were recovered from appellant's person following a search incident to arrest. He did not specify an amount. Although defense counsel asked Trooper Moore on cross-examination several questions regarding the subsequently obtained search warrant for the Lexus, the warrant, in which it was written that the police recovered 20 grams of suspected cocaine from appellant's person following his arrest, was apparently not admitted into evidence. Even if the court's findings in this regard were clearly erroneous, the findings were irrelevant because the seizure of the Lexus was based on the positive canine sniff, not on the drugs recovered from appellant following his arrest.

**II.**

Appellant argues that the trial court abused its discretion when it admitted into evidence a letter he purportedly wrote while an inmate at the Wicomico County Detention Center. Specifically, appellant argues that the State's handwriting expert's opinion, that she was "virtually certain" that the letter was written by appellant, was not sufficient to authenticate the letter because "absolute certainty" was required. The State responds that appellant is wrong. We agree.

Prior to trial, defense counsel moved in limine to exclude from admission at trial a letter purportedly written by appellant. At a subsequent hearing, a Wicomico County Detention Center employee testified that on January 21, 2015, she intercepted a letter in the outgoing detention center mail and sent a scanned copy of the letter to the State's Attorney's Office. The letter was addressed to Sophia Schiabe, appellant's fiancée, and

17

signed by appellant. Handwriting exemplars were subsequently obtained from appellant. A handwriting expert testified that after comparing the "unique identifying characteristics" of the scanned letter to the handwriting exemplars she was "virtually certain" that the letter was written by appellant. The expert testified that "virtually certain" is the "highest value" a handwriting expert can give a scanned copy of a document while a "positive identification" is the highest value for an original document. The expert explained that the "virtually certain" standard was a positive identification that did not detract from the identification but only denoted that the identification was based on a copy not the original. At the conclusion of the hearing, the court denied the motion in limine, ruling that the letter was properly authenticated. The letter was admitted at trial without objection.

Md. Rule 5-901(a), governing the authentication of evidence, provides that authentication, a condition precedent to admissibility, "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The Rule sets forth a non-exhaustive list of ways a document may be authenticated, including by way of "[c]omparison by the court or an expert witness with specimens that have been authenticated." Md. Rule 5-901(b)(3). "[T]he burden of proof for authentication is slight, and the court need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the jury ultimately might do so." *Johnson v. State*, 228 Md. App. 27, 59 (quotation marks, citation, and emphasis omitted), *cert. denied*, 450 Md. 120 (2016).

As explained in 2 McCormick on Evidence § 227 (John W. Strong ed.1999):

> [T]he authenticity of a writing or statement is not a question of the application of a technical rule of evidence. It goes to genuineness and conditional relevance, as the jury can readily understand. Thus, if a prima facie showing is made, the writing or statement comes in, and the ultimate question of authenticity is left to the jury.

Thus, once a *prima facie* showing of authenticity is made, the ultimate question of authenticity is left to the jury. We review a trial court's decision regarding authenticity for an abuse of discretion. *Miller v. State*, 421 Md. 609, 622 (2011). *See also Gerald v. State*, 137 Md. App. 295, 304–05 ("A trial judge's decision to admit or exclude evidence will not be set aside absent an abuse of discretion.")(citations omitted), *cert. denied*, 364 Md. 462 (2001).

Appellant's argument that the letter should not have been admitted at trial because it was not properly authenticated is not preserved for our review because he did not object when the letter was admitted into evidence at trial. *See Reed v. State,* 353 Md. 628, 637 (1999)("where a party makes a motion *in limine* to exclude irrelevant or otherwise inadmissible evidence, and that evidence is subsequently admitted, the party who made the motion ordinarily must object at the time the evidence is actually offered to preserve [its] objection for appellate review")(quotation marks and citation omitted). Even if appellant had preserved his argument for our review, we would have found it without merit. Clearly, "absolute certainty" is not the required standard for authentication. The expert's opinion that the letter was "virtually certain" to have been written by appellant based on her comparison of the scanned letter to the exemplars overcame the low bar necessary for authentication.

Appellant argues that the trial court erred when it admitted into evidence a cell phone service receipt found during the police search of the van. Specifically, appellant argues that the receipt was not properly authenticated and constituted inadmissible hearsay. The State disagrees, arguing that the receipt was properly authenticated and was admissible circumstantial evidence, not inadmissible hearsay.

Prior to trial, appellant moved in limine to exclude admission of the receipt at trial. At a subsequent hearing, the State called the general manager of Genesis Services, a cell phone business, who identified the receipt as a sales receipt from his store. He testified that he was "able to pull up a copy" of the receipt from the Genesis Services's "system," and had brought a copy of the receipt with him. The receipt memorializes a transaction on July 25, 2014, in which $30 worth of minutes was bought for cell phone number 760-774-5871. The general manager testified that he did not know, and the receipt did not state, who came into the store and purchased the plan.

After the manager's testimony, appellant stated that he would submit on the authentication argument. Appellant then argued that the receipt constituted inadmissible hearsay because the State was attempting to prove the truth of the matter asserted – that the phone number on the receipt was appellant's cell phone number. The State responded that the receipt was not hearsay because it intended to use the receipt as "nonassertive circumstantial evidence of a number being associated with [appellant]." The trial court agreed with the State and denied the motion, ruling that the receipt "was not an implied assertion of the factual proposition that that number belonged to the Defendant. Merely, it

20

was circumstantial evidence that could be probative of that fact." Appellant did not object to the admission of the receipt into evidence at trial.

## Authentication

Appellant has failed to preserve his authentication argument on appeal because he "submitted" below on the issue. *See* Md. Rule 8-131(a)(Ordinarily, the appellate court will not decide any issue "unless is plainly appears by the record to have been raised in or decided by the trial court[.]"). Additionally, appellant has not preserved his argument that the receipt was not properly authenticated because he did not object to the admission of the receipt at trial. *See Reed*, 353 Md. at 637. However, even if appellant had preserved his argument for our review, we would have found it without merit. As stated above, Maryland's authentication rule lists several means of authentication, including: "[c]omparison by the court . . . with specimens that have been authenticated" and "[c]ircumstantial evidence[.]" Md. Rule 5-901(b)(3), (4). Clearly, the receipt was authenticated on both bases – by comparing the receipt with the copy pulled from the Genesis Services's system, and the similarity of the copy and receipt was circumstantial evidence of the receipt's authenticity. Like the letter written by appellant, this was sufficient to overcome the low bar necessary for authentication.

## Hearsay

"Hearsay" is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). Hearsay is generally inadmissible at trial because of its inherent untrustworthiness, unless some exception applies. *See* Md. Rules 5-802 and 5-

21

802.1; *see also Parker v. State*, 365 Md. 299, 312-13 (2001). Clearly, the purpose for which the document is admitted will determine whether the evidence constitutes hearsay. "Whether evidence is hearsay is an issue of law reviewed *de novo*." *Bernadyn v. State*, 390 Md. 1, 8 (2005).

Three cases are relevant to determine whether the receipt constituted inadmissible hearsay or was admissible circumstantial evidence: *Bernadyn*, *supra*; *Fields v. State*, 168 Md. App. 22, *aff'd*, 395 Md. 758 (2006); and *Fair v. State*, 198 Md. App. 1 (2011).

In *Bernadyn*, during the execution of a search warrant for a residence at 2024 Morgan Street in Edgewood, the police arrested Michael Bernadyn, the sole occupant of the residence, and seized, among other things, large quantities of marijuana and a medical bill. The question before the Court of Appeals was "whether a medical bill containing the words 'Michael Bernadyn, Jr., 2024 Morgan Street, Edgewood, Maryland 21040' is hearsay when used to establish that Michael Berndayn lived at 2024 Morgan Street in Edgewood, Maryland." *Bernadyn*, 390 Md. at 8-9. During closing argument, the State repeatedly argued that the bill established that Bernadyn lived at the residence. *Id*. at 4-7. The Court of Appeals held that, under the circumstances presented, the bill constituted inadmissible hearsay, explaining that "[t]he State did not argue simply that an item bearing Bernadyn's name was found in the house and that Bernadyn probably resided at the house. Rather, the State argued that the bill itself was 'a piece of evidence that shows who lives there.'" *Id*. at 11, 14-15, 23. The Court added that the bill constituted inadmissible hearsay because "the State suggested that Bayview Physicians had Bernadyn's correct address

22

because 'any institution is going to make sure they have the right address when they want to get paid.'" *Id*. at 11.

In *Fields, supra*, Saturio Fields was charged with, among other things, first-degree murder of a man at a bowling alley. At trial, the trial court admitted into evidence that Fields's nickname, "Sat Dogg," was among those displayed on a monitor screen above one of the bowling lanes. *Fields*, 168 Md. App. at 29. The question before us on appeal was whether the evidence that Fields's nickname was on the monitor was an implied assertion that Fields "was present in the bowling alley that night, and was offered by the State to show his presence; or whether it was an item of circumstantial crime scene evidence from which reasonable jurors could infer that [Fields] was present in the bowling alley that night." *Id*. at 36. After reviewing the distinction in *Bernadyn* between evidence admitted to show the truth of the declarant's belief and evidence admitted as circumstantial evidence linking defendant to a particular item, we concluded that the nickname on the screen was admissible non-hearsay evidence for it was evidence from which a juror could infer that Fields was present in the bowling alley the night of the murder. *Id*. at 38.

In *Fair, supra*, we reaffirmed our holding in *Fields*. In *Fair*, Arnell Fair was arrested, and during a search of an automobile that the police had reason to believe Fair had driven, the police seized marijuana and a firearm, next to which was a paycheck issued to Fair and dated the day before the seizure. *Fair*, 198 Md. App. at 3-7. The paycheck was admitted into evidence, and during trial the State emphasized the date on the check, arguing in closing: "[Appellant] who knew that there was a gun in there when he put his paycheck in there within the last 24 hours, because the paycheck was dated the day before and it had

23

to be within 24 hours." *Id*. at 7.  On appeal, we held that the trial court committed no error in admitting the check, stating:

> [W]e are persuaded that the check was merely circumstantial non-assertive crime scene evidence. Though the recent date of the paycheck was emphasized, the date on which appellant was paid was not a contested issue in the case. The contents of the check, including the date, were not relevant to the crime with which appellant was charged. Its relevance was that its presence supported an inference that appellant, who happened to be the payee of the check, had recently accessed the console and was therefore aware of its contents.

*Id.* at 37-38.

Appellant has not preserved his argument that the receipt was inadmissible hearsay because he did not object to the admission of the receipt at trial.  *See Reed,* 353 Md. at 637.  Even if preserved, however, we are persuaded that admission of the receipt did not violate the rule against hearsay.  Here, the State did not use the receipt to assert that appellant's phone number was the number on the receipt.  Rather, the State used the receipt to link appellant to the phone to establish appellant's whereabouts and cell communications with Stewart before, during, and after the murder.  For example, during closing argument, the State argued:  "We know we can trust the number.  When [appellant] is arrested a short time later he's got the phone receipt in his van from Genesis Services.  And it's got the phone number, 760-774-5871.  That's *the connection* between him to that phone." (emphasis added).  Because there was no assertion "to prove the truth" of any matter contained in the receipt, the receipt was properly admitted into evidence as non-hearsay evidence.

24

**IV.**

Appellant argues that the trial court erred when it admitted "other crimes" evidence, *i.e.*, evidence that he committed drug crimes in Delaware in 2011. Specifically, appellant argues that the trial court failed to undertake the required three-part analysis before the evidence was admitted at trial, and the evidence was not relevant and unduly prejudicial. The State disagrees, as do we.

Prior to trial, appellant moved in limine to preclude the State from admitting evidence of his 2011 drug crimes involving Guzman to show motive. In support of its motion, defense counsel argued that there was little evidence that appellant knew of Guzman's participation as a confidential informant in the drug crimes, and therefore, the risk of unfair prejudice outweighed its probative value. The State responded that appellant's knowledge of Guzman's participation would be shown through the testimony of the Delaware detective that he gave appellant or left at appellant's home a copy of the search warrant, which detailed the confidential buys in which appellant and Guzman participated. The court ruled that the State could introduce the other crimes evidence to prove motive but agreed to defense counsel's request to give a limiting instruction to the jury.

At trial, defense counsel sought and was granted a continuing objection to the testimony of Detective Thomas Lamon of the Delaware State Police. Detective Lamon testified that in June, July, and August 2011, Guzman worked for the Delaware police as a confidential informant and made five controlled buys of cocaine from appellant. One controlled buy occurred in a parking lot off a highway; the other four took place just outside

25

of appellant's home in Dover, Delaware where he lived with his wife and stepson. The detective testified that he witnessed the controlled buys that occurred outside appellant's home. Based on the controlled buys, in September 2011, the detective executed a search warrant for appellant's home, after which appellant was arrested. The detective testified that he could not remember if, after appellant's arrest, he gave appellant a copy of the search warrant or left a copy at his home. A copy of the search warrant was admitted into evidence. The detective additionally testified that after appellant was released on bond, "we haven't had [any] word of him. He disappeared." After Detective Lamon's testimony, the trial court gave the jury the following limiting instruction:

> Ladies and gentlemen, yesterday you heard testimony of alleged prior drug activity from 2011 involving the Defendant in Delaware. The testimony that you heard has the limited purpose in this trial or has a limited purpose in this trial and you may only consider that as evidence of a prior relationship between the [D]efendant and Radames Guzman the decedent as well as a possible motive. You may not consider that evidence for any other purpose. And you must not infer that just because the Defendant allegedly committed a prior wrong that he's more likely to be guilty in the present case. So, again, what you heard yesterday from the Delaware State Police Sergeant is for the limited purpose of showing there is a prior relationship between the Defendant and the decedent and as well as a possible motive. That is the only purpose that you can consider that testimony for.

Md. Rule 5-404(b) provides that:

> **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts . . . is not admissible to prove the character of a person in order to show action in conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

26

It is well-settled that subject to several exceptions, evidence of other crimes is not admissible in Maryland. *Hurst v. State*, 400 Md. 397, 406 (2007). It may be admissible, however, if the "evidence is substantially relevant to some contested issue in the case and is not offered to prove guilt based on propensity to commit crimes." *Id*. at 407 (citation omitted).

A three-part analysis is required before other crimes evidence is admitted. First, the court must determine whether the evidence fits into one or more of the exceptions. *Sifrit v. State*, 383 Md. 116, 133 (2004)(citing *Faulkner v. State*, 314 Md. 630, 634 (1989)). This is a legal determination. *Id*. (citation omitted). Second, it must be shown by "clear and convincing" evidence that the defendant engaged in the alleged criminal acts. In this regard, "[w]e review the trial court's decision to determine if there is sufficient evidence to support" its finding. *Id*. (citation omitted). Third, the court must find that the probative value of the evidence outweighs any unfair prejudice. *Id*. (citation omitted) "This determination involves the exercise of discretion by the trial court." *Id*. (citation omitted).

Appellant puts forth two arguments to support his contention that the trial court erred in admitting the other crimes evidence. Appellant first argues that the trial court erred because it "did not undertake the required analysis[.]" Contrary to appellant's argument, the trial court did state that the other crimes evidence was admissible to prove motive and the other crimes evidence was proven by clear and convincing evidence based on what was written in the search warrant and Detective Lamon's testimony that he witnessed several of the controlled buys. Although it is true that the trial court did not place its balancing of the probative versus prejudicial impact of the evidence on the record, the court was not

27

required to do so. "The fact that the record does not reflect whether a trial court conducted the balancing test does not mean the court did not do so." *Jones v. State*, 178 Md. App. 123, 144 (2008). This is because "[t]here is a strong presumption that judges properly perform their duties." *Id*. (quotation marks and citation omitted). *See also Ridgeway v. State*, 140 Md. App. 49, 69 (2001)(rejecting challenge to trial court's failure to expressly conduct a balancing test regarding admissibility of other crimes evidence), *aff'd on other grounds*, 369 Md. 165 (2002).

We also reject appellant's second argument that the other crimes evidence was irrelevant and prejudicial because it did not contain "direct proof" that appellant knew of Guzman's "cooperation with the police or involvement in the criminal case against him." It is true that the warrant did not identify Guzman specifically, but appellant could have easily deduced Guzman's identity based on the dates, places, and circumstances of the drug transactions described in the warrant, which Detective Lamon testified he had either given a copy to appellant or left a copy at appellant's home where he lived with his wife and stepson. Additionally, appellant's knowledge that Guzman had acted as a confidential informant can be inferred from the letter he wrote to his fiancée that was confiscated while he was held at the detention center following his arrest. In the letter he wrote:

> I have to tell you the truth about what I know [about] what happened to Radames. One day Emily & Jess and I was talking about how friends have been back stabbed by friends. . . . So I had told them about how my so called friend had set me up and how the courts was trying to give me a lot of time for it and that I was on the run for the charges. They asked me who he was and I told them his name.

28

We also note that following the detective's testimony the trial court gave an instruction to the jury to limit any undue prejudice. Under the circumstances presented, we are persuaded that the trial court did not err in admitting evidence that appellant committed drug crimes in Delaware.

**V.**

Lastly, appellant sets forth several arguments regarding the sufficiency of the evidence as to his convictions for first-degree murder, his conspiracy convictions (conspiracy to commit first-degree murder, conspiracy to commit first-degree assault, and conspiracy to commit kidnapping) and his handgun convictions (wearing, carrying or transporting a handgun, and use of a handgun in the commission of a felony or crime of violence). Appellant's arguments are either not preserved or meritless. We shall address each argument in turn.

The standard for appellate review of evidentiary sufficiency is "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Taylor v. State*, 346 Md. 452, 457 (1997)(quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "That standard applies to all criminal cases, regardless of whether the conviction rests upon direct evidence, a mixture of direct and circumstantial, or circumstantial evidence alone." *Smith v. State*, 415 Md. 174, 185 (2010)(citation omitted). "Where it is reasonable for a trier of fact to make an inference, we must let them do so, as the question is not whether the [trier of fact] could have made other inferences from the evidence or even refused to draw any inference, but whether the inference [it] did make was supported

29

by the evidence." *State v. Suddith*, 379 Md. 425, 447 (2004)(quotation marks and citation omitted)(brackets in *Suddith*). This is because weighing "the credibility of witnesses and resolving conflicts in the evidence are matters entrusted to the sound discretion of the trier of fact." *In re Heather B.*, 369 Md. 257, 270 (2002)(quotation marks and citations omitted). Thus, "the limited question before an appellate court is not whether the evidence *should have or probably would have* persuaded the majority of fact finders but only whether it *possibly could have* persuaded *any* rational fact finder." *Allen v. State*, 158 Md. App. 194, 249 (2004)(quotation marks and citation omitted).

### First-degree murder conviction

Appellant has waived any argument regarding premeditation. In his brief, appellant makes only one argument to support his position that the State failed to establish premeditation: "[Defense] counsel argued that there was insufficient proof of premeditation to establish murder in the first degree." This is insufficient. *See* Md. Rule 8–504(a)(6)(An appellate brief "shall" contain "[a]rgument in support of the party's position on each issue."). Because appellant offers no support for his position, we shall not address it. *See Poole v. State*, 207 Md. App. 614, 633 (2012)(we will not consider appellant's argument where it is made in one sentence, in a footnote, and with no supporting argument)(cases cited therein).

### Conspiracy convictions

Appellant was convicted of three counts of conspiracy: conspiracy to commit first-degree murder, conspiracy to commit first-degree assault, and conspiracy to commit

kidnapping. Appellant argues that the only evidence "tending" to prove conspiracy was Stewart's testimony that two men, appellant and another man, whom she recognized but did not know his name, assaulted and kidnapped Guzman, and Barham's testimony that when Stewart returned Eisman's car, appellant and a man named "Terrell" were waiting to pick her up in appellant's Lexus. Appellant argues that this testimony was insufficient to prove an agreement to commit conspiracy and points out that Stewart's and Barham's testimony lacked credibility.

In *Mitchell v. State*, 363 Md. 130, 145 (2001), the Court of Appeals summarized the elements of common law conspiracy as a "combination of two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. The essence of a criminal conspiracy is an unlawful agreement." (quotation marks and citations omitted). The Court added: "The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design." *Id.* (quotation marks and citations omitted). We have stated:

> In conspiracy trials, there is frequently no direct testimony, from either a co-conspirator or other witness, as to an express oral contract or an express agreement to carry out a crime. It is a commonplace that we may infer the existence of a conspiracy from circumstantial evidence. If two or more persons act in what appears to be a concerted way to perpetrate a crime, we may, but need not, infer a prior agreement by them to act in such a way. From the concerted nature of the action itself, we may reasonably infer that such a concert of action was jointly intended. Coordinated action is seldom a random occurrence.

*Jones v. State*, 132 Md. App. 657, 660, *cert. denied*, 360 Md. 487 (2000). *See also Alston v. State*, 177 Md. App. 1, 42 (2007)("Conspiracy may be proven through circumstantial evidence, from which an inference of a common design may be shown.")(citation omitted),

31

*aff'd*, 414 Md. 92 (2010).  As to the State's burden of proof, we have explained:  "[I]t is sufficient if the parties tacitly come to an understanding regarding the unlawful purpose. In fact, the State was only required to present facts that would allow the jury to infer that the parties entered into an unlawful agreement."  *Dionas v. State*, 199 Md. App. 483, 532 (2011)(quotation marks and citation omitted), *rev'd on other grounds*, 436 Md. 97 (2013).

Contrary to appellant's argument, Stewart's and Barham's testimony was sufficient for a juror to infer a conspiracy between appellant and Terrell Lakes.  *Cf. Jones v. State*, 132 Md. App. at 661-64 (holding that there was sufficient evidence of conspiracy where, among other circumstances, the defendants emerged from an alley together and approached the victim).  Appellant's argument that Stewart and Barham were not credible is of no consequence – credibility is a matter left to the fact-finder and we do not re-weigh on appeal evidence presented at trial.

### Handgun convictions

Appellant argues that there was insufficient evidence to sustain his convictions for wearing, carrying, or transporting a handgun and use of a handgun in the commission of a felony or a crime of violence because the State failed to prove that a "handgun" was used. Appellant, as the State correctly argues, has failed to preserve his argument for our review.

Md. Rule 4-324(a) provides, in pertinent part: "A defendant may move for judgment of acquittal . . . at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence.  *The defendant shall state with particularity all reasons why the motion should be granted.*" (emphasis added).  The rule is mandatory.  *Bates v. State*, 127

32

Md. App. 678, 691 (citing *State v. Lyles*, 308 Md. 129, 135 (1986)), *cert. denied*, 356 Md. 635 (1999).

Appellant argued below that that the evidence did not establish whether he or the "other man" used a gun. On appeal, appellant argues that there was no proof that a "handgun" was used in the crimes. *See* Crim. Law § 4-203 (criminalizing the wearing, carrying, or transporting of a handgun) and § 4-204 (criminalizing use of a firearm, which includes a handgun, in the commission of a crime of violence or felony). By not arguing below the argument he now raises on appeal, appellant has failed to preserve his argument for our review. *See Berry v. State*, 155 Md. App. 144, 180 (because appellant raised different issues in his motion for judgment of acquittal before the trial court than he raises on appeal, he has failed to preserve the issues he raises on appeal for our review), *cert. denied*, 381 Md. 674 (2004).

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

33